Herbert **PATE** et al., Plaintiffs,

v.

**DADE COUNTY SCHOOL BOARD** et al., Defendants.

No. 69–1020–Civ–CA.

United States District Court,
S. D. Florida,
Miami Division.

June 26, 1970.

SCHOOLS WITH MODIFICATIONS AND FINAL JUDGMENT

ATKINS, District Judge.

This school desegregation case presents the issue of whether the Dade County School System is now unitary within the meaning of Supreme Court decisions in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and the decision of the United States Court of Appeals for the Fifth Circuit in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969).

The case sub judice had its genesis on August 25, 1969 when the Dade County School Board (hereinafter the Board) removed to this Court a civil action filed in the Circuit Court of the Eleventh Judicial Circuit In and For Dade County, Florida, which attacked, on state grounds, an Interim Desegregation Plan adopted by the Board. That plan was approved by an order which I entered on August 29, 1969.

On December 10, 1969, pursuant to the mandate of *Singleton, supra,* I entered an order which, inter alia, directed the Board to take steps, not later than February 1, 1970, to comply with the provisions of that decision relating to the Desegregation of Faculty and Other Staff, Majority to Minority Transfer Policy, Transportation, School Construction and Site Selection and Attendance Outside System of Residence.

In its Final Desegregation Plan filed March 31, 1970, the Board specifically delineated its compliance with the above requirements of *Singleton, supra,* and with *Green, supra,* with respect to extracurricular activities and facilities. There has been no complaint regarding any of these particular elements which go to disestablishing a dual school system by any of the many objectors. Accordingly, the Court must assume there has been compliance in these areas.

Larry Stewart, of Frates, Fay, Floyd & Pearson, Miami, Fla., for plaintiffs.

Pate, Bolles, Goodwin, Ryskamp & Ware through George Bolles, Miami, Fla., for the School Board.

Tobias Simon, Miami, Fla., for intervenor, Classroom Teachers Assn., Inc.

MEMORANDUM OPINION APPROVING DESEGREGATION PLAN FOR DADE COUNTY PUBLIC

Thus, there remains only a determination of whether the composition of student bodies meets the necessary tests.

Hearings were held on January 23, May 22 and June 12, 1970 on the proposed plan and objections.

Findings of Fact made in the Order entered January 26, 1970 are incorporated herein by reference.

The Board urged at the hearing on May 22 that its plan came within the purview of a true "neighborhood system" as defined by Ellis v. Board of Public Instruction of Orange County, Florida, 423 F.2d 203 (5th Cir., 1970). I find otherwise. Because of the criteria demanded in *Ellis*, as further delineated in Andrews et al. v. City of Monroe et al., 425 F.2d 1017 (5th Cir. 1970), such a plan is infeasible in Dade County. Clearly, the inflexible *Ellis* standards are not present in the system proposed by the Board.

The criteria used in reviewing, and modifying where indicated, the Board's plan were: (1) degree of desegregation, (2) proximity of students to schools serving their grade level; (3) capacity of such schools; (4) manmade and natural boundaries such as thoroughfares, railroad tracks, etc. and (5) avoidance of cross-bussing.

The Board will operate in the school year 1970–71 an urban school system of 218 schools and 244,000 students in the southeast corner of the Florida peninsula. Of this number, 57,900 or 23% will be Black. There are some 26 communities in the County, all of which project westerly from the Atlantic Ocean which forms the eastern boundary.

The plan filed by the Board on March 31, 1970 reflects a substantial effort, made in good faith, to create a unitary school system. However, under the guidelines laid down for this Court by recent decisions of the Fifth Circuit, the plan as it exists must be held to be ineffective in disestablishing the dual school system.

By an order entered April 16, 1970 the Florida School Desegregation Consulting Center, School of Education, University of Miami, Coral Gables, Florida, was requested to review the Board's plan and all objections filed to it. The Center was asked to report its recommendations to the Court with the stated objective of meeting the constitutional standard of a unitary system. The report from the Center was filed by the Department of Health, Education and Welfare (hereinafter HEW).

The HEW plan limits its recommendations, except in one particular, to the elementary schools. That one exception concerns Miami Jackson High School which will be 85% Black under the Board's plan.

Leave to intervene was granted to some persons who objected to portions of the plan. The Dade County Classroom Teachers' Association (hereinafter CTA), representing approximately 75% of the teachers in the system actively participated as an intervenor. It urged, in general, a much more substantial increase in the mixing of the races, particularly at the junior and senior high school levels. The American Civil Liberties Union proposes that the Court require a fixed ratio in every school in the County. The law does not require such drastic action to achieve a unitary system. The objections filed by other intervenors will be considered below.

The Court is indebted to intervenors Honorable Claude R. Kirk, Governor of Florida, and Honorable William C. Cramer, a Member of Congress from Florida, for submitting briefs on the subject of bussing as it relates to integration.

Wide publicity was given the HEW report. This has resulted in a plethora of letters, telegrams, pictures, maps and petitions being sent to the Court from parents of children who, presumably, would be affected by the HEW changes. Virtually all of these expressed no opposition to integration per se but adjured the Court not to require their children to cross highways, walk past

nearby schools to attend one farther away, or enter so-called "ghetto" areas to attend school. I have given careful consideration to these objections vis a vis my duty to effect a unitary school system in Dade County. They have been very helpful in understanding the problems of each school.

PUPIL ASSIGNMENTS

The plan submitted by the Board allows 20 schools to remain with 100% Black enrollments. Additionally, there will be 16 schools with various percentages of Black enrollments ranging from 99% down to 85%. There would be 53 schools with all White enrollments and 40 schools with percentages ranging from 99% to 85%.

The plan submitted by HEW would bring below 85% Black enrollment five 100% Black schools and seven 85% to 99% Black schools. At the same time three 100% White schools and ten 85% to 99% White schools would be brought below 85% White enrollments.

The HEW plan makes no recommendation for changing the Board plan on the junior high and senior high levels. Hence, fifteen 100% Black schools (11 elementary, 3 junior high and 1 senior high) and nine 85% to 99% Black schools (7 elementary, 1 junior high and 1 senior high) will remain under the HEW plan.

With the modifications to be described below the School Board plan does effectively disestablish the dual school system which exists in Dade County. For the sake of convenience the Court will discuss the modifications it feels are necessary by reviewing the HEW plan in the same order as evidence was presented at the May 22, 1970 meeting.

ELEMENTARY SCHOOL LEVEL
 SOUTH DISTRICT
 GROUP #1

■ The Board plan proposes what must be described as square zones with a school somewhere near the middle of the zone. The HEW plan completely rezones the group of schools creating elongated zones. The HEW plan would require additional transportation of 32 pupils to the Lewis School and 20 pupils to the Redondo School. Students living in the north section of the Lewis zone pass within ¼ mile of two schools. Students living across the street from the West Homestead School will walk nearly two miles to the Redondo School. The HEW plan is unacceptable despite its effectiveness in disestablishing the dual school system in this District.

The Court is at a disadvantage in making modifications in the Board plan because it does not have the statistical data necessary for informative decisions. The testimony reveals that the Cooper School is 113 pupils under capacity (2-4 classrooms) and the West Homestead School is 85 pupils over capacity. Page seven of the HEW plan shows Lewis to be exactly at capacity and Florida City to be over capacity by 90 students. It appears to the Court that the overcapacity could be eliminated while encouraging desegregation of the Cooper and West Homestead Schools by slight changes in the boundary lines of these four schools. The East-West boundary between Lewis and Florida City could be moved to the South by 90 students. The East-West boundary between Lewis and Cooper could be moved to the South and the North-South boundary between West Homestead and Cooper could be moved to the West so as to equalize the capacities of those three schools.

The School Board shall show cause within ten days of the date hereof why such a modification will not promote desegregation and is not administratively, economically or educationally feasible.

GROUP #2

■ Again the School Board plan offers a zoning plan. The HEW plan would pair these three schools thus eliminating one predominantly White school. No additional transportation would be required. The Bel-Aire School would be approximately 30

students over capacity. However, the Administration feels this is a feasible alternative. The Court is aware that there are hazards along the line of travel to the Moton School but feels that with a minimum of effort by the appropriate governmental agencies these hazards could be reduced. Nevertheless these hazards should not impede what is otherwise an effective plan.

The School Board is directed to adopt this modification.

GROUP #3

The Court agrees that there is no feasible method to desegregate the Pine Villa School.

ELEMENTARY SCHOOL LEVEL
 SOUTHWEST DISTRICT

The Board plan leaves the Martin School with a 100% Black enrollment. It phases out the Lee School which prior to the 1969–70 school year was an all-Black School but which was as of June, 1970 a school with 72% Black enrollment. The HEW plan offers no solution to the Martin problem and defers to the Court on the wisdom of phasing out the Lee School.

Again the Court is without sufficient statistical data. The record shows that as a school housing grades 1 to 5, Martin will have an enrollment of 1,025 students. The sixth grade is housed at the Richmond Heights Junior High School. There are seven portables at the Martin School. The Colonial Drive School houses grades 1 thru 6 with a projected enrollment of 720 students, 27% of whom are Black. The Court notes what appear to be large undeveloped areas between the two schools on the south side of Coral Reef Drive.

█ The Board shall show cause within ten days of the date hereof why the Martin and Colonial Drive Schools cannot be paired. Emphasis should be directed at encouragement of desegregation, administrative inconvenience, relative capacities and additional transportation required.

Since the May 22, 1970 hearing the Court has granted intervenors Corbett and Ellis a rehearing so that they might offer testimony on the phasing out of the Lee School. Testimony was taken on June 12, 1970.

The School Board has made the determination that the pairing of Lee and Ludlum in the 1969–70 school year was a failure. The Court agrees, it appears to be useless to attempt a pairing of Lee with any of the other neighboring schools. The Board plan eliminates the Lee zone and in effect drives wedges into the Black residential area surrounding the Lee School from each of four surrounding predominantly White schools. The percentages of Black students will now vary from 8% to 38% instead of 1% to 64% at the end of the 1969–70 school year. Nor does it appear that the phasing out of one of the four neighboring schools would encourage desegregation as well. Without pairing or massive cross-walking of virtually entire student bodies Lee could not continue to operate effectively as a desegregated school.

It should be added that the Lee facility will be used to house various programs all of which have been seeking a permanent home for some time. It was the Board's decision to convert the use of the Lee facility and the Court will not interfere with that decision since it promotes the establishment of a unitary school system.

ELEMENTARY SCHOOL LEVEL
 NORTHWEST DISTRICT
 GROUP #1

The School Board plan again offers square zones. The HEW plan proposes a grouping. Since the three schools tend to be at opposite ends of their zones, approximately 274 additional students will have to be bussed over two miles. The grouping plan would create a substantial undercapacity at the Bunche Park School while it creates an overcapacity at the Parkview School requiring at least two portables. It should be noted that the Board plan does not

require crossing of either Northwest 167th Street or Northwest 17th Avenue.

■ The Court finds the HEW plan to be unreasonable. Being unable to find another method to desegregate the Bunche Park School, the Court reluctantly embraces the Board plan.

#### GROUP #2

The Court agrees that desegregation of the North County School cannot be accomplished without extensive use of transportation.

#### GROUP #3

The Board plan suggests two zones with boundaries determined by natural barriers. The North-South boundary between the zones is eliminated by the HEW plan. Instead, the HEW plan would make the Rainbow Park zone a long, thin zone running East and West. The net effect is to put some of the Opa Locka School's White students in the Rainbow Park School and some of the Rainbow Park Black students in the Opa Locka School. This plan requires approximately 35 additional students to be bussed and many students to travel across Northwest 27th Avenue.

■ The HEW plan effectively disestablishes the dual school system in this area. The Board is directed to adopt this modification.

#### GROUP #4

The Board plan zones these two schools according to natural boundaries. The HEW plan would pair them by eliminating the boundary between them at Opa Locka Boulevard. The pairing requires an additional 19 students to be bussed and most students to cross Opa Locka Boulevard. Both schools were already well within their capacities.

■ It should be noted that the Young School is projected to have an enrollment of 85% Black students. The Court is hopeful that under the majority to minority transfer policy to be described below, many White students will seek to attend the Young School

from the Opa Locka School and vice versa. Therefore no further modification of the Board plan is required to create a unitary school system in this District.

### ELEMENTARY SCHOOL LEVEL NORTH CENTRAL DISTRICT

■ There are ten schools in this District clustered together in the heart of an all-Black residential community. Eight of the schools (Drew, Evans, Holmes, Liberty City, Lorah Park, Olinda, Orchard Villa and Poincianna Park) have 100% Black student bodies. Two others (Arcola Lake and Gladeview) have predominantly Black student bodies. The only method by which these schools could be effectively desegregated is by cross-bussing with predominantly White schools in the Northeast District. The law does not compel this Court to require the School Board to desegregate these schools in that manner. The School Board plan is, therefore, adopted without change as to these ten schools.

The School Board plan would allow the West Little River School to remain with a 92% Black student body. The HEW plan suggests a pairing with the Broadmoor School (1% Black). This alternative would require that approximately 55 students would be transported to the West Little River School. Others would have to travel across Northwest 27th Avenue. Under either plan, both schools are projected to be slightly over capacity.

The Board is directed to adopt this modification. The Court notes that the attendance zones of both Broadmoor and Miami Park are varied under the HEW plan. The Court leaves to the discretion of the Board the decision of whether such a variance should be made or, if made in another manner, whether it might reduce the number of students transported to the West Little River School. The Board is limited to the extent that no substantial change shall be made in the racial compositions of the two schools.

## ELEMENTARY SCHOOL LEVEL
### SOUTH CENTRAL DISTRICT

The Board plan allows to remain 5 all-Black schools (Carver, Floral Heights, Pharr, Tucker and Wheatley) and 5 predominantly Black schools (Allapattah, Bethune, Douglas, Dunbar and Earlington Heights). As discussed below, the HEW plan would affect several of these schools. HEW concedes that Allapattah, Earlington Heights, Floral Heights, Wheatley and Douglas cannot be desegregated without substantial transportation. The Court is unwilling to make that concession without further evidence.

The statistics the Court has reveal that the Allapattah School houses 1170 pupils in grades 1 thru 5. The Buena Vista School houses 695 pupils in grades 1 thru 6. It appears that these two schools could be paired. The Board shall show cause within ten days of the date hereof why such a modification will not promote desegregation and is not administratively, economically or educationally feasible.

Likewise the statistics in the Board plan reveal that the Douglas School houses 1400 pupils in grades 1 thru 6. The Riverside School houses 850 pupils in grades 1 thru 6. It appears that these two schools could be paired. The Board shall, in a like manner, show cause why this pairing cannot be accomplished.

The Board plan proposes two separate zones for the Bethune and Melrose Schools. The HEW plan suggests a pairing of the two schools. The testimony reveals that the pairing would not present any problems with capacities nor would it require additional transportation. The sole objection is that the East-West Expressway is eliminated as a natural barrier between the two schools. Considering that the Expressway is elevated and that many Melrose students are required, under the Board plan, to traverse Northwest 36th Street and Northwest 27th there is no reason why these schools cannot be paired

■ The Board is directed to adopt this modification.

At this point, for the sake of better understanding, the Court will depart from the pattern of presentation of the HEW plan. The Court notes a concentration of schools between Biscayne Boulevard and the North-South Expressway on the east and west, respectively, and 14th Street and 36th Street on the south and north, respectively. There are five schools in this area: Dunbar (93% Black), West Dunbar (15% Black), Wheatley (100% Black), Miramar (20% Black) and Buena Vista (7% Black).

The Board proposes to do nothing to desegregate these schools. The HEW plan would group the Dunbar, Miramar and Buena Vista Schools. The Board offers the sole objection that grouping destroys their neighborhood plan. The Court feels that the grouping should be accomplished.

In this regard, the Court notes that the capacities of the remaining two schools in the area are such that by a modification of the HEW grouping plan substantially more desegregation could be accomplished. For instance, if the Wheatley School was rezoned and used in the grouping suggested by the HEW, Dunbar could be paired with the West Dunbar School. Alternatively, it might be feasible to pair Miramar with Wheatley and to pair Dunbar with West Dunbar. Again, Buena Vista could be substituted for West Dunbar in that pairing.

The Board shall show cause within ten days of the date hereof why they cannot involve all five of these schools in a plan to disestablish the dual school system in this area. The same criteria as ordered above shall be considered. Should the Board show good cause why additional desegregation cannot be accomplished it is the Order of this Court the grouping plan presented by the HEW plan be adopted by the Board.

The Board plan provides separate zones for the Kelsey Pharr and Comstock Schools with the boundary between them falling on the East-West Expressway. The HEW plan pairs these

two schools. The evidence reveals that the Kelsey Pharr School has a strict capacity of 840 students without portables. The Comstock School presently has a capacity of 1200 with portables. The Board plan properly balances these capacities. The pairing plan would require the transportation of approximately 123 students to the Kelsey Pharr School.

It appears to the Court that the capacity problem could be solved in one of two ways. Either portables could be moved from the Comstock School to the Kelsey Pharr School or the Kelsey Pharr School be designed to house only grades 5 and 6 within present capacities or with the addition of but a few portables.

The Board is directed in a like manner as above to show cause why the HEW pairing plan cannot be accomplished with the modifications suggested above.

In the Coral Gables area the Board offers a strict zone plan for five schools: Sunset (8% Black), Carver (100% Black), Coral Gables (0% Black), Tucker (100% Black), and Dade (1% Black). The HEW plan would rezone the first three schools and pair the last two. All five will be considered together because the rezoning and pairing plan are closely interrelated.

In rezoning Carver, Sunset and Coral Gables, the HEW plan puts 400 White students into the Carver zone from the Sunset and Coral Gables zones and puts 400 Black students in the Coral Gables zone from the Carver zone. This plan creates an overcapacity of over 100 students at Coral Gables which might force that school to begin double sessions because there is no room for portables on the site. Approximately 57 students will require transportation. Many students will be required to cross South Dixie Highway. Many students will be required to walk greater distances.

The Court is mindful that the Sunset School is proposed to absorb students who formerly attended the Lee School. Also it appears that the HEW plan rezones many students from the Dade School zone into the Coral Gables School zone. The net effect of the HEW plan is to take 150 students out of the Sunset School and place them in the Coral Gables School. It would seem that by returning 100 students to Sunset from Carver and returning 100 students to Carver from Coral Gables the capacities of the three schools will be equalized. If White students and Black students are returned to Sunset and Carver, respectively, no additional transportation will be required and both Carver and Coral Gables will remain as desegregated schools.

The Court favors the HEW plan of rezoning but is concerned with equalizing capacities. The Board shall investigate the above suggestions and investigate rezoning in connection with the pairing of the Dade and Tucker Schools and show cause, in a like manner as above, why the HEW rezoning plan cannot be accomplished. In the alternative, if it is found that a rezoning plan is not feasible, the Board shall show cause why a ten-hour day or some alternative scheduling technique cannot be utilized.

The HEW plan would pair the Tucker and Dade Schools. Mr. Little testified that the proposed pairing plan would create an overcapacity of about 100 students at both schools. Apparently this is caused by increasing the student population by an amount equal to the number of 5th and 6th graders who are not now allowed to attend Tucker. However, it does not appear that Mr. Little considered two factors. First, the figure used by the HEW plan for enrollment at the Tucker School is overstated by 200 students, thus distorting the HEW plan figures. Second, the HEW rezoning plan discussed immediately above rezones many students out of the Dade attendance zone.

Mr. Little also testified that there is no space at Tucker for portables but there may be space at Dade. The pairing plan would require many students to cross South Dixie Highway and travel

routes which are presently undergoing sewer construction.

The Court favors the HEW pairing plan and feels that the School Board can fashion a plan utilizing rezoning techniques, portables and modified school days which will effectively disestablish the dual school system without sacrificing traditional values. It might be possible to have the Dade and Tucker Schools house grades 1 thru 5 in a paired situation and place grade 6 in Carver Junior High School.

The Board shall, in a like manner, show cause why this pairing cannot be accomplished.

## ELEMENTARY SCHOOL LEVEL NORTHEAST DISTRICT

The Northeast District encompasses the area east of the North-South Expressway and the Sunshine State Parkway and North of 110th Street. Within its boundaries are the municipalities of Miami Beach, North Miami Beach and North Miami. There are 22 elementary schools with only 216 Black students.

There is no method by which the schools in this District can be effectively desegregated other than by massive cross-bussing with the predominantly Black residential areas of the North Central District and the South Central District. The Court, therefore, adopts the plan of the Board as it pertains to the Northeast District.

## JUNIOR HIGH SCHOOL LEVEL

The Board proposes a zoning plan designed to allow every student to attend the closest school to his home that has the capacity to house him. The guidelines used by the Board are many faceted: (1) proximity to schools; (2) capacity of schools; (3) natural barriers; (4) safety and welfare of the children. All of the optional zones which were present in the Interim Plan adopted by this Court on August 29, 1970 have been eliminated.

The HEW plan makes no recommendation to change the Board plan with one exception. The HEW plan takes the attitude that since most of the students who formerly attended Dorsey will be bussed to other schools all these students should be bussed to predominantly White schools. This suggestion is unacceptable for two reasons. First, it ignores the relative capacities of the other junior high schools in this part of the County. It is unlikely that the predominantly White schools could handle all of the former Dorsey students without severe overcrowding. Second, many former Dorsey students can walk to nearby schools. For both reasons the Court rejects the suggestion of the HEW plan.

Utilizing the Board plan at this level without modification there will be remaining three all-Black schools, one predominantly Black school, six all-White schools and twelve predominantly White schools. The remaining seventeen schools all have a substantial racial mixture.

The Court will discuss the objections to the Board plan in the same order as it discussed the elementary level schools.

## SOUTH DISTRICT

The only objection to the Board plan in this District centers around the Richmond Heights School. The alternative is popularly called the Roberts Plan. The HEW plan attests to the educational soundness of this plan. The Board has also conceded to its educational soundness.

The Roberts Plan would rezone the boundaries of the Richmond Heights, Palmetto and Cutler Ridge Schools. It is similar to Recommendation 41 of the report rendered July 23, 1969 by the Florida School Desegregation Consulting Center. The apparent sole goal of the plan is to distribute the Black students at the Richmond Heights School between the Palmetto and Cutler Ridge Schools so that they will all have similar mixes of the races.

The Board offers several reasons for its decision not to implement the Roberts Plan. It creates a non-contiguous zone

whereby students would be transported past the Richmond Heights School. The Palmetto School is already 150 students over capacity even though it utilizes a triple shift. The Richmond Heights School is several hundred students under capacity solely because it is projected to be on a ten-hour day. The Richmond Heights School houses the Martin Elementary School sixth grade because the Martin School does not have the capacity even though it is utilizing seven portables. The Roberts Plan requires the sixth grade to return to the Martin School from which other students will be transported out to other elementary schools. The Board puts emphasis upon their decision that it is the lesser of two evils to have students on a triple shift at Palmetto.

 The Board has made an administrative decision that should not be interfered with by the Court. The schools in this District are presently substantially desegregated. The Court orders no change in the plan offered by the Board.

### SOUTHWEST DISTRICT
The only school in this District which is the subject of an objection is the Richmond Heights School discussed in the South District section. The Court orders no change in the Board plan.

### NORTHWEST DISTRICT
The plan proposed by the CTA would involve three schools in this District. (Filer, North Dade and Parkway). Since only the Palm Springs School does not have members of the minority race, the HEW plan offers no recommendation. The CTA suggestion concerning the Filer School will be discussed below in the South Central District section.

The CTA plan is designed solely for the purpose of creating a racial mix of 40% Black students in both schools. North Dade is 68% Black and Parkway is 20% Black. The plan would pair the two. In response to the argument that this would force students to cross the

Palmetto By-pass, the CTA points out that the Board plan requires students in the Carol City attendance zone to cross the same highway. The plan also would require some additional transportation.

 The most significant objection to the CTA plan is that since there are three grades and but two schools either the Board will have to put one and one-half grades in each school or split the students between the two schools by some method such as the first and last thirteen letters of the alphabet. This is clearly educationally unsound. Since both schools exist as desegregated schools there is no reason to destroy the traditional organization of the junior high school. For this reason the Court rejects the CTA plan and adopts the Board plan.

### NORTH CENTRAL DISTRICT
Other than the plan offered by the CTA involving the Drew, Madison, Mann and Edison Schools no objection is lodged against the Board plan. These schools will be discussed below in the South Central District section. The HEW plan recognizes that the only school in this District that does not have a substantial racial mixture is Drew. The HEW plan asserts that the only method by which the Drew School could be desegregated is by utilizing massive cross-bussing of students between non-contiguous zones. Again you have the recurring problem of violating the traditional concept of a three-grade junior high school. The Court adopts the Board plan.

### SOUTH CENTRAL DISTRICT
There are two schools (Allapattah and Brownsville) in this District which remain all-Black schools and one school (Washington) which remains a predominantly Black school. The HEW plan asserts that it would require cross-bussing between non-contiguous zones to effectively desegregate these schools. The CTA plan is the only objection to the Board plan.

■ The CTA plan recognizes that the Ada Merritt School is an all-White school. The plan would pair the Ada Merritt School with the Washington School. To the objection that pairing would require students to cross the Miami River, the CTA replies that the Board has designed the Miami Springs attendance zone to require students to cross the Little River. However, there is a crossing immediately adjacent to the Miami Springs School. The Board further objects to the basis that the present boundaries effectively utilize the capacities of the two schools. The Court feels there is no compelling reason to pair these schools since Washington is projected to have an enrollment of 88% Black students. Therefore, the Court rejects the CTA plan.

■ The CTA plan also attempts to desegregate the Allapattah, Brownsville and Drew Schools by cross-bussing students with the predominantly White schools to the west (Filer and Miami Springs). Also included as potential cross-bussing routes are three desegregated schools in the North Central District (Madison, Mann and Miami Edison) and two non-contiguous schools in the Northeast District which are within a six mile radius of this area and which are already receiving transported students from the Drew School (Nautilus and Fisher). The Court commends the CTA for its inventiveness but feels that the law does not require this type of massive cross-bussing to create a unitary school system. The plan offered by the CTA is rejected and the plan of the Board is adopted.

The Board has adopted a pairing plan involving the Ponce de Leon and Carver Schools whereby the seventh grade would be housed at the Carver School and the eighth and ninth grades would be housed at the Ponce de Leon School. The Carver School will have a 24% Black enrollment while the Ponce de Leon School will have a 26% Black enrollment. This plan is adamantly supported by the intervenors Jane L. Mack and others. The HEW plan makes no reference to this segment of the Board plan.

The pairing plan is strenuously opposed by two groups of intervenors (Donald J. Murray and others and The Concerned Parents of the Riviera Section). Both groups offer a zoning plan commonly referred to as the Ring-Horwich Plan. The intended purpose of this plan is to desegregate one additional school (Shenandoah) while keeping both the Ponce de Leon and Carver Schools as traditional three-grade junior high schools. By redrafting the boundary lines between these two schools and the Shenandoah School (1% Black) the Black student enrollment at the Shenandoah School will be increased. After this rezoning Shenandoah will be 12% Black, Carver will be 19% Black and Ponce de Leon will be 16% Black, thus equalizing the percentages of Black students at the three schools.

The rezoning plan would require more than minimal additional transportation. Since the Shenandoah School is three miles from the Carver School many students within walking distance of Carver will need to be transported to Shenandoah. Other students living close to the Carver School will require transportation to the Ponce de Leon School.

The supporters of the Ring-Horwich Plan have attempted to show that it is best educationally to utilize the traditional three-grade junior high school at all three of these schools. The School Board would concede this as a general principle. However, the Board has decided that because of the lack of full facilities (library, shops, laboratories, etc.) at the Carver School it is best to house all of this area's eighth and ninth graders in the Ponce de Leon School. Seventh graders do not require a full range of school facilities whereas eighth and ninth graders do require them. Under the Ring-Horwich Plan the eighth and ninth graders at the Carver School would be disadvantaged by the lack of facilities. The facilities that do exist at the Carver School, if used solely by

seventh graders, would enhance their educational experience.

It therefore appears that the Board has made its decision based upon educational and administrative reasons. To interfere with the Board's decision solely to desegregate one more predominantly Black school when a unitary school system presently exists appears to the Court to be unreasonable. The majority to minority transfer plan to be discussed below should aid in the further desegregation of the Shenandoah School.

Accordingly, the Court adopts the Board pairing plan.

## NORTHEAST DISTRICT

There are no predominantly Black schools in the Northeast District. All six schools have some pupils of the minority race under the Board plan. The only objection raised, other than the CTA plan discussed above, is presented by Michael A. Frank who, through his father as next friend, has filed his own lawsuit which has been consolidated into this case.

The objection, simply stated, is that it is a violation of Plaintiff's constitutional rights to require him to attend a school (Fisher) further from his home while other students are transported to his former school (Nautilus) from distances up to 12 miles past several other schools. Additionally, Black students are transported from non-contiguous zones into both schools. The Board asserts that the primary, in fact the sole, reason for this arrangement is to equalize the capacities of the various schools involved.

Since the Board made its recent decision to close down the Dorsey School at least ten schools are being used to house the students that attended Dorsey. Drew has been severely over capacity for years. Fisher and Nautilus were the only schools within a reasonable distance which could house this overflow. Likewise the students living in the northern part of Miami Beach were transported to Fisher because it was the nearest school with available facilities.

The Court feels that no constitutional issue is presented by the Frank objection. The objection is simply an attack upon an administrative decision of the Board and nothing more. The Frank objection is rejected and the Board plan is adopted.

## SENIOR HIGH SCHOOL LEVEL

The Board plan proposes a system of zoning whereby each student attends a full three-year high school. Distances and capacities are the primary consideration. There would be remaining one all-White school, nine predominantly White schools, one all-Black school and one predominantly Black school.

The HEW plan suggests that if the boundary between the Miami Jackson School (85% Black) and the Miami Senior High School was made firm and the two attendance zones were strictly adhered to there would be approximately 1000 more White students attending Miami Jackson. The Board estimates that this figure would be closer to 700 students. In previous years between 200 and 300 students in the Miami Jackson attendance zone have been attending Miami Senior High by use of a procedure called "affidavit of attendance." The evidence is somewhat conflicting on whether or not the Board plan proposes to strictly adhere to the attendance zones.

The CTA plan proposes a pairing of these two schools. The evidence reveals that a pairing plan is prohibitively expensive by virtue of the extensive bussing required. There are presently 100 students being transported to the Miami Jackson School. Pairing would require transportation for 1500 students to the Miami Jackson School. A similar situation would be created at Miami Senior High School. This transportation would require an aggregate outlay of $330,000 the first year with recurring expenses of $100,000 annually. On page 4 of the transcript of the February 2, 1970 hearing this Court found that the "Board

is utilizing its allowable full tax millage, has an annual budget of 70 to 75 million dollars and is urgently in need of more funds."

■ The pairing plan is rejected and the plan of the Board is accepted with the direction that the attendance zones of these two schools be strictly adhered to, modified only by the majority to minority transfer policy to be discussed below.

The plan offered by the CTA points out that there are over 5000 Black students attending Miami Northwestern (100% Black) and Miami Jackson (85% Black). This means that approximately 55% of all Black high school students attend one of these two schools. The CTA plan seeks to desegregate the Miami Northwestern School by offering alternative grouping plans.

First, the CTA plan would establish a grouping or campus by combining the attendance zones of Miami Northwestern, Miami Edison (27% Black) and Miami Central (30% Black). The campus concept would create a ratio of White to Black students of approximately 47% to 53%. The Miami Edison School is one mile east of the Miami Northwestern School and the Miami Northwestern School is less than two and one-half miles south from the Miami Central School. The geographic area is comparable to that of the Coral Gables Senior High School attendance zone.

Second, the CTA proposes a campus grouping of Miami Northwestern, Hialeah (1% Black) and Miami Springs (9% Black). Evidence relating to these schools was taken at a prior hearing.

The Board offered no objections on the administrative and educational level although the Court feels assured that the same problems exist here as discussed above in the grouping of junior high schools in the Northwest District. The evidence does reveal, however, that the campus grouping plan would be detrimental to the normal high school experience. Students would be hampered in participating in extra-curricular activities (debate, athletics, band, etc.) from which activities many students receive college scholarships.

The evidence establishes that in the grouping situation there would be increased transportation problems. At least 1000 additional students will require transportation. Only 100 are presently being transported. Approximately $330,000 would be required in the first year to implement the grouping plan.

■ The grouping plan is rejected and the plan of the Board is adopted.

## NO CROSS-BUSSING

Neither the Board's plan, as modified herein, nor the HEW plan involve "cross-bussing". As provided by Florida law, students living more than two miles from the school they attend are entitled to transportation.

## PUPIL REASSIGNMENT

■ The Board plan is also to be amended to provide as follows:

1. Any pupil, with parental consent, shall have the right to transfer from a school at which his race is in the majority to attend a school at which his race is in the minority, regardless of the availability of space at the latter school, and the Board shall furnish free transportation provided the distance involved meets state transportation statutes.

2. All parents in the system are to be notified of this provision.

## BI-RACIAL COMMITTEE

■ A Bi-Racial Committee composed of 12 members, six White and six Black, will be appointed by the Court to review the operation of the majority to minority pupil transfer rule, the transportation system, selection of school sites, and such other special assignments as the Court may direct. The Committee is authorized to hold hearings and make recommendations to the Board in connection with these activities. The chair-

manship shall alternate annually between a White chairman and a Black chairman. Within ten days, the Board and CTA shall each submit to the Court two names and each of the intervenors one name of nominees for the Committee.

## REPORT BY THE BOARD AND BI-RACIAL COMMITTEE

Within sixty days after the opening of the Fall term of the 1970–71 school year, the Board and Bi-Racial Committee are directed to file reports with the Court as to their findings and recommendations with respect to the operation of the plan as implemented by the Board.

## MAYS JUNIOR HIGH SCHOOL EXPERIENCE

This suit was begun, as above recited, by Herbert Pate and others in the State Circuit Court. Its purpose was to enjoin the Board from assigning students for the school year 1969–70 to Mays Junior High School, a previously all-Black school, as part of its plan to desegregate Dade County Schools. With the approval of the Interim Desegregation Plan, such assignments were effectuated. The Court is now informed by means of the news media that integration at Mays has been successful. Accordingly, the Bi-Racial Committee shall, promptly following its appointment, study the practices and procedures utilized at that school and submit a report within thirty days to the Court, together with its recommendations for possible utilization of such practices and procedures by the Board at other integrated schools in the system.

## CONCLUSION OF LAW

The plan submitted by the Board, as modified herein, and subject to the revisions to be accomplished as above directed, constitutes a unitary system of public education for the Dade County, Florida school district.

## FINAL JUDGMENT

It is ordered and adjudged that:

1. The Board of Public Instruction of Dade County, Florida, and Edward L. Whigham, as Superintendent of Public Instruction, and his successors in office, are permanently enjoined from operating a dual system of public education segregated by race, and shall henceforth operate a unitary system as described above.

2. The transfer of students shall be made effective August 1, 1970 and thereafter.

3. The separate petitions of the several intervenors are hereby denied, except as the relief therein sought may be included in the over-all plans herein approved. The separate suits by Michael A. Frank (Case No. 69–1025–Civ–CA) and Joseph Pardo (Case No. 69–1041–Civ–CA) which were consolidated with this suit involve attacks upon administrative decisions by the Board. No constitutional issue is presented. Accordingly, the relief sought in both suits is denied and both suits are hereby dismissed with prejudice.

4. The Court retains jurisdiction of the cause and the parties for the purpose of insuring that the plan here adopted and the required amendments are carried out and the school system operated consistently with the requirements of the United States Constitution.