434 F.2d 1151
 Herbert PATE et al., Plaintiffs,
v.
DADE COUNTY SCHOOL BOARD et al., Defendants-Appellees,
v.
CORAL REEF CIVIC ASSOCIATION, Inc., et al., Intervenors-Appellants.
Herbert PATE et al., Plaintiffs-Appellees,
v.
DADE COUNTY SCHOOL BOARD et al., Defendants-Appellees-Cross-Appellants,
v.
Alice LOVE, Carswell Washington et al., Intervenors-Appellants-Cross-Appellees.
 No. 29039.
 No. 29179.
 United States Court of Appeals, Fifth Circuit.
 August 12, 1970.
 
 James W. Matthews, Miami, Fla., for Love et al., intervenors-appellants-cross-appellees.
 Larry S. Stewart, Miami, Fla., for Pate, plaintiff-appellee.
 Claude R. Kirk, Jr., Gov., Tallahassee, Fla., for State of Fla., Fred C. Davant, Miami, Fla., for Immerfall & Russell, appellees-cross-appellants.
 Jerris Leonard, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Gerald Mager, Legal Counsel to Gov., Tallahassee, Fla., for State of Fla.
 Henry A. Edgar, Jr., Miami, Fla., for Coral Reef Civic Assn., Inc. et al., intervenors-appellants.
 George C. Bolles, Miami, Fla., for Dade County School Board, defendants-appellees-cross-appellants.
 Rivers Buford, Jr., Tallahassee, Fla., for State Board of Education, intervenor-appellee.
 Tobias Simon, Miami, Fla., for Dade County Classroom Teachers' Assn., intervenor-appellee.
 Paul B. Steinberg, Miami Beach, Fla., for Dade County Education Assn., appellees-cross-appellants.
 Shutts & Bowen, Miami, Fla., for Richard and Anne Piper and Miami Shores Village, intervenors-appellants.
 William C. Cramer, U. S. Rep., Congress of the U. S., Washington, D. C., anicus curiae.
 Before JOHN R. BROWN, Chief Judge, and MORGAN and INGRAHAM, Circuit Judges.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 The question in this school desegregation case is whether the Dade County school system has been converted from a dual to a unitary school system, as defined in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S. Ct. 29, 24 L.Ed.2d 19 (1969), under the district court's orders and memorandum opinions dated June 26, 1970, 315 F. Supp. 1161, and July 24, 1970.
 
 
 2
 Following the approach of Ellis v. Board of Public Instruction of Orange County, Florida, 5 Cir., 1970, 423 F.2d 203; Mannings v. Board of Public Instruction of Hillsborough County, Florida, 5 Cir., 1970, 427 F.2d 874; Davis v. Board of School Commissioners of Mobile County, 5 Cir., 1970, 430 F.2d 883; and Bradley v. Board of Public Instruction of Pinellas County, Florida, 5 Cir., 1970, 431 F.2d 1377, we herein review all of the six criteria of Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), in determining whether Dade County has been effectively converted into a unitary school system.
 
 FACULTY AND STAFF
 
 3
 In its final desegregation plan filed on March 31, 1970, the board states that:
 
 
 4
 The staffs of elementary schools have been reorganized so that in each elementary school the proportion of black and white teachers approximates the 24% black-76% white ratio existing among all elementary teachers in the school system.
 
 
 5
 The staffs of junior high schools have been reorganized so that in each junior high school the proportion of the black and white teachers approximates the 21% black-79% white ratio existing among all junior high teachers in the school system.
 
 
 6
 The staffs of senior high schools have been reorganized so that in each senior high school the proportion of black and white teachers approximates the 12.2% black-87.8% white ratio existing among all senior high teachers in the school system.
 
 
 7
 Likewise, administrative personnel, teacher aides and other staff personnel have been reorganized so as to accomplish desegregation. Effectuation of this portion of the board's plan, which the district court assumed to have already been effectuated as per its February 1, 1970, deadline, must be continued for the 1970-1971 school year.
 
 TRANSPORTATION FACILITIES, AND EXTRACURRICULAR ACTIVITIES
 
 8
 The board's plan also effectively desegregates the transportation, the facilities, and the extracurricular activities of the Dade County school system. It calls for the continuation of its practice of making accessible to school children of both races these three elements of the school system devoid of racial discrimination.
 
 
 9
 There being no objection to these elements, the district court properly found that they have been effectively desegregated by the board's plan.
 
 
 10
 The record also indicates that there has been in existence in Dade County a majority-to-minority transfer policy. In addition to the continuation of this feature of the school system's operation, the board is commended to establish a bi-racial committee similar in function to that established in Ellis, supra, and as described in the district court's opinion in this case (see Appendix "A", p. 1170).
 
 STUDENT ASSIGNMENT
 
 11
 The Dade County school board (hereinafter board) submitted its final desegregation plan as to student body desegregation on March 31, 1970. The Department of Health, Education and Welfare (hereinafter HEW) submitted its desegregation plan on May 15, 1970. Hearings on these plans were conducted by the district court on May 22 and June 12, 1970. That court's findings of facts and final judgment with reference to pupil assignments were entered June 26, 1970, and are contained in its Memorandum Opinion Approving Desegregation Plan for Dade County Public Schools with Modifications and Final Judgment attached as Appendix "A". In response to the district court's orders to show cause contained in that memorandum opinion, the board submitted two reports to the district court on July 6, and July 20, 1970, which answered with specific detail why certain schools in the system could not be paired, grouped or rezoned so as to effectively disestablish the dual school system. These reports form the basis of the district court's modifications of its June 26 opinion, which modifications are embodied in its Supplemental Order Approving Desegregation Plan for Dade County Public Schools, as Modified, and Amended Final Judgment, attached as Appendix "B". Together, Appendices "A" and "B" make up the district court's final order approving a desegregation plan for the Dade County public school system.
 
 
 12
 The board will operate 218 schools in the Dade County school system for the 1970-71 school year (161 elementary, 40 junior high, and 17 senior high schools). There will be 244,000 students in the system, of whom 57,900 or 23% will be Negro. The school system will be served by 187 buses, which, as of June 1970, transported some 30,376 students throughout the system. Forty additional buses have been ordered by the board and should be available for the 1970-71 school year.
 
 
 13
 The district court approved of the board's plan but substantially modified it by adopting some of the recommendations made by HEW, the Dade County Classroom Teachers Association (C.T.A.), intervening parents and neighborhood groups, and by making some modifications of its own initiative. As seen in Appendix "C", the board's plan leaves 36 schools all- or virtually all-Negro, housing 37,672 Negro students or 64% of the Negro student population. The modifications contained in both the district court's opinions (Appendix "A" and Appendix "B") reduce these figures substantially, but still leave 22 schools all- or virtually all-Negro, housing 25,595 or 44% of the Negro student population. Though great diligence has been taken by the district court in reducing this percentage, we find that many of the reasons given for not achieving a greater degree of desegregation and the final results accomplished are unacceptable. In keeping with Ellis, supra, Mannings, supra, Davis, supra, and Bradley, supra, we have studied the maps, the various plans, and the many details covered by the district court's thorough opinions, and have on our own initiative made the modifications which hereinafter comprise the body of this opinion. The purported obstacles to pairing, grouping or rezoning, which are meticulously covered in the district court's opinions in Appendices "A" and "B", have been given careful consideration. These obstacles include traffic hazards, school capacities, individual school programs, format and curricula, walking distances, natural barriers, and grade levels in each school — all of which are given substantive merit in the district court's opinion in Appendix "B". Of particular importance, in this case is the recurring problem of the Spanish-speaking students in the school system who number 50,500 and comprise 21% of the entire Dade County student population. These are the children of the more than 300,000 Cuban refugees who have settled in Miami. Many of the schools in which these Spanish-speaking students are predominant are situated adjacent to many of the all- or virtually all-Negro schools in the central portion of the City of Miami.
 
 
 14
 However real all of these obstacles may be, the mandates of Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954), Alexander, supra; and Adams v. Mathews, 5 Cir., 1968, 403 F.2d 181, leave little room for exception. The obstacles presented by the board admittedly make difficult the modifications needed to desegregate many of Dade County's schools. But these problems
 
 
 15
 "cannot be accepted if the [board] plan's implementation fails to result in substantial desegregation * * * Certainly, each of these [problems] is a relevant consideration for any plan which the board may hereafter adopt. However, none of these factors or even all combined are of overriding importance of the one factor the Indianola School Board did not consider: effective promotion of desegregation."
 
 
 16
 United States v. Indianola Municipal Separate School Dist., 5 Cir., 1969, 410 F.2d 626, 628.
 
 
 17
 The following modifications reduce the number of Negro students attending all- or virtually all-Negro schools from 44% to 24% of the entire Negro student population. Implementation of these modifications effectively desegregate the Dade County school system. However, the district court is not precluded hereby from approving any plan submitted by the board which will achieve substantially the same results as achieved by our modifications or an even greater degree of desegregation. Such a plan must, of course, be approved by the district court and must be implemented as of the beginning of the 1970-71 school year. If no such plan is submitted, the district court is directed to implement the following modifications:
 
 
 Elementary Schools
 
 
 18
 It is ordered that Lewis (582 Negroes, 18 whites) be paired with Cooper (108 Negroes, 507 whites) as per the district court's order.
 
 
 19
 It is ordered that West Homestead (680 Negroes, 110 whites) be paired with Florida City (50 Negroes, 400 whites) as per the district court's order.
 
 
 20
 Moton (formerly 98% Negro) has been desegregated by grouping it with Bel-Aire and Perrine, both formerly predominantly white schools. Such a grouping has resulted in a percentage of Negroes in each school of 42%, 46% and 36% respectively. The district court properly denied the board's request for a rehearing on this grouping.
 
 
 21
 Pine Villa (759 Negroes, 66 whites) must remain virtually all-Negro due to its isolation in the southern area of the district. HEW made no recommendations as to this school.
 
 
 22
 Martin (1,025 Negroes, 0 whites) is left all-Negro by the district court's orders. The board, in its recent report, interjected that a pairing of Martin with Colonial Drive (194 Negroes, 520 whites) would disrupt the "pod type" teaching technique and facility at Colonial Drive. As pointed out in Indianola, supra, such an objection cannot be permitted to impede the desegregation of a dual school system. It is therefore ordered that:
 
 
 23
 (1) Martin be paired with Colonial Drive, or
 
 
 24
 (2) Martin be paired with Vineland (41 Negroes, 1009 whites) which is more distant but still adjacent to the Martin attendance zone.
 
 
 25
 It is ordered that Bunche Park (840 Negroes, 0 white) be grouped with Parkview (10 Negroes, 505 whites) and Scott Lake (9 Negroes, 841 whites) as recommended by the HEW plan and as approved by the district court.
 
 
 26
 North County is left 88%-Negro by the district court's order, and, since it is isolated in the northern portion of the school system, it must remain as such. HEW made no recommendation as to this school.
 
 
 27
 Rainbow Park (formerly 100% Negro) and Opa-locka (formerly 2% Negro) were ordered rezoned in the district court's first opinion (Appendix "A", p. 1163) as per HEW recommendations, resulting in a racial composition of 419 Negroes, 551 whites, attending Opalocka, and 290 Negroes, 400 whites attending Rainbow Park. There being no valid objections to this pairing, it is ordered that they be paired.
 
 
 28
 It is ordered that Young (433 Negroes, 77 whites) likewise be paired with Westview (0 Negro, 685 whites), there being no valid objections to this pairing.
 
 
 29
 In the north-central district of the school system, there are 11 all- or virtually all-Negro schools tightly clustered in the central area of the City of Miami. Of these schools, the district court's opinions leave nine all- or virtually all-Negro. As to six of these schools — Drew, Evans, Liberty City, Olinda, Orchard Villa, and Poinciana Park — there appears to be no feasible method of desegregating these schools. The attendance zones of all six of these schools are bordered by attendance zones of schools which are either already paired with outlying substantially white schools or are all-Negro themselves.
 
 
 30
 However, as to the remaining five all-or virtually all-Negro schools, West Little River (formerly 92% Negro) has been paired with Broadmoor (formerly 1% Negro) as recommended by the HEW plan, and as approved by the district court (Appendix "A", p. 1163).
 
 
 31
 It is ordered that Arcola Lake (740 Negroes, 100 whites) be paired with Blanton (101 Negroes, 674 whites). There are no valid objections to this pairing raised in the district court's opinion (Appendix "B", p. 1177), and further investigation would only result in delay in desegregating this school.
 
 
 32
 Holmes Complex (1575 Negroes, 0 whites) houses its large all-Negro student body in three buildings, situated three or four blocks from each other. Close to this complex are Little River (385 Negroes, 715 whites) and Edison Park (470 Negroes, 415 whites). There being no valid objections to this grouping presented by the board or in the district court's opinion (Appendix "B", p. 1177), it is ordered that these three schools be grouped. The capacity of the schools in this grouping could best be utilized by housing the Headstart programs and grades one and two from all three schools, plus grade three of Holmes Complex in Holmes Complex, thus leaving intact the primary facilities there. Grades three and four from all three schools (except grade three of Holmes Complex) could be housed in Edison Park, using portables at that site; and grades five and six from all three schools (except Edison Park which has no sixth grade) could be housed in Little River. However, the ultimate allocation of grades and student enrollment to the three schools in this grouping is left to the discretion of the board. While the resulting racial composition of such a grouping is 2,430 Negroes, 1,130 whites, many of whom are Spanish-speaking, it is possible that the board may devise a more desirable plan to desegregate Holmes Complex before the commencement of the 1970-71 school year.
 
 
 33
 It is ordered that Gladeview (622 Negroes, 13 whites) be paired with Hialeah (0 Negro, 895 whites). The schools are under two miles apart and there are many crossings of the Seaboard Airline Railroad available in between the paired schools. Capacities and language programs do not prevent this pairing, and the resulting racial composition is 622 Negroes, and 908 whites.
 
 
 34
 It is ordered that Lorah Park (740 Negroes, 0 white) be paired with Curtiss (0 Negro, 570 whites). None of the purported obstacles to this pairing raised by the board (Appendix "B", p. 1177) is to preclude the desegregation of Lorah Park.
 
 
 35
 It is ordered that Allapattah (1160 Negroes, 10 whites) be paired with Santa Clara (174 Negroes, 521 whites). Again, the objections to such a pairing based on the language problem at Santa Clara, the traffic conditions, and the lack of a sixth grade at Allapattah (Appendix "B", pp. 1173-1174) cannot be fixed as obstacles to the desegregation of the Allapattah school. However, since the racial composition resulting from such a pairing is 1332 Negroes and 532 whites, it is possible that the board may devise a more desirable method of desegregating the Allapattah school before the commencement of the 1970-71 school year.
 
 
 36
 Douglas (1372 Negroes, 28 whites) is bordered on the south by two predominantly white schools — Riverside (20 Negroes, 1825 whites) and Southside (7 Negroes, 343 whites). Both of these schools being no more than two miles distant from Douglas, it is ordered that Douglas:
 
 
 37
 (1) be paired with Riverside, again discarding the board's objections as to such pairing (Appendix "B", p. 1174),
 
 
 38
 or
 
 
 39
 (2) be grouped with Riverside and Southside, with grade allocation and student enrollments in the grouped schools to be determined by the board.
 
 
 40
 Under either alternative, a desirable racial composition is to result.
 
 
 41
 Bethune (formerly 97% Negro) has been paired with Melrose (formerly 3% Negro) as recommended by HEW and as approved by the district court.
 
 
 42
 As to the desegregation of Dunbar (944 Negro, 71 whites) and Wheatley (1005 Negroes, 0 white), we adopt the language of the district court used in its opinion in Appendix "B", pp. 1174-1175, except as it applies to Douglas. The district court is directed to insure that the plan eventually devised by the board effectively desegregates these two all- or virtually all-Negro schools and is implemented for the 1970-71 school year.
 
 
 43
 It is ordered that Pharr (850 Negroes, 0 white) be paired with Comstock (15 Negroes, 1435 whites) as recommended by HEW. Again, the board's objections to such a pairing (Appendix "B", p. 1174) cannot be recognized as valid reasons for not desegregating the Pharr school. The allocations of grade levels (which may require the use of portables) and students in these paired schools is left to the discretion of the board.
 
 
 44
 Earlington Heights (902 Negroes, 18 whites) and Floral Heights (835 Negroes, 0 white) are left all- or virtually all-Negro by the district court's opinions. HEW has made no recommendation. These two schools are within the same concentrated area of the six Negro schools in the north-central district that were left all-Negro, supra. There does not appear to be any feasible method of desegregating these two schools.
 
 
 45
 As to the Carver school (593 Negroes, 0 white) the district court had adopted the HEW rezoning plan, adding such modifications (see Appendix "B", pp. 1175-1176) which we deem appropriate in that under either of the district court's alternatives, Carver is effectively desegregated. The district court is directed to insure that the board acts promptly in carrying out its modified HEW rezoning plan, so that Carver opens the 1970-71 school year on a desegregated basis.
 
 
 46
 Tucker (712 Negroes, 0 white) is left all-Negro under the district court's opinions. The reasons for not desegregating this school (Appendix "B", p. 1176) cannot be recognized as valid objections to the pairing of Tucker and Dade (5 Negroes, 660 whites). Therefore, it is ordered that Tucker:
 
 
 47
 (1) be paired with Dade, or
 
 
 48
 (2) be grouped with Dade and Coconut Grove, the farthest distance among them being only one mile, such grouping resulting in a more desirable racial composition.
 
 
 Junior High Schools
 
 
 49
 There are four junior high schools which remain all- or virtually all-Negro under the district court's opinions (see Appendix "C"). Our modifications, hereinafter discussed, apply only to these four junior high schools.
 
 
 50
 Drew Junior High (1550 Negroes, 0 white) is situated in the northern part of that concentration of the Negro elementary schools in the center of the City of Miami discussed above, and is also over three miles from the nearest predominantly white junior high school. HEW made no recommendation as to the desegregation of the school. The district court properly rejected the C.T.A. plan (Appendix "A", p. 1167). We, therefore, find that there is no feasible method of desegregating this school. However, many of its students will have attended elementary schools which are desegregated under the modifications heretofore set forth.
 
 
 51
 B. T. Washington Junior High (1646 Negroes, 224 whites) is bordered on the south by two 100%-white junior high schools — Citrus Grove (1679 whites) and Merritt (1005 whites). The three schools are only two miles distant at the farthest point. Many students who live closer to Citrus Grove and Merritt are zoned into the Washington zone. It is therefore ordered that Washington be desegregated:
 
 
 52
 (1) by pairing it with Citrus Grove, or
 
 
 53
 (2) by grouping it with Citrus Grove and Merritt.
 
 
 54
 Under either alternative, the resulting racial composition is desirable. The allocation of grade levels and students among the three schools is to be determined by the board. Again, those objections to grouping or pairing raised by the board and given recognition in the district court's opinion (Appendix "B", p. 1178) cannot stand as valid reasons for not desegregating the B. T. Washington Junior High School.
 
 
 55
 Allapattah Junior High School (1480 Negroes, 0 white) is located in the center of that concentration of the Negro elementary schools discussed above. However, to the east and south, and contiguous thereto are Miami Edison (745 Negroes, 500 whites, grades six through eight) and Lee (105 Negroes, 1095 whites, grades seven through nine) both of which are within two miles of Allapattah. It is ordered that these three schools be grouped. Again, the board's objections to this grouping (Appendix "B", p. 1179) cannot be recognized here. However, since the grade levels attending these three schools vary, the difficult problem of student allocation within the three schools' capacities is left to the expertise of the board. It is also possible that, with approval of the district court, the board may devise a rezoning plan involving these three schools, or some other plan that effectively desegregates the Allapattah school prior to the commencement of the 1970-71 school year. The district court is directed to implement the grouping plan discussed above for the 1970-71 school year if an alternative plan from the board which effectively desegregates Allapattah is not forthcoming.
 
 
 56
 The fourth and final all- or virtually all-Negro junior high school in Dade County is Brownsville (1440 Negroes, 0 white) on the western portion of the concentration of Negro schools in central Miami. To the west and contiguous thereto is Miami Springs (282 Negroes, 1283 whites). On the basis of reasons which have heretofore been rejected, the district court concluded that the Brownsville school could not be desegregated (Appendix "B", pp. 1179-1180). However, these reasons, being unacceptable to this court, do not prevent the desegregation of the Brownsville school by either of the two following methods:
 
 
 57
 (1) by pairing Brownsville with Miami Springs, being two and one-half miles apart, or
 
 
 58
 (2) rezone both zones so that the Miami Springs zone is extended into the Brownsville zone, taking one-half of Brownsville's Negro students (approximately 720 students) and placing them in the Miami Springs zone. Likewise, the Brownsville zone lines are to be extended into the northeastern area of the Miami Springs zone so as to take into the Brownsville zone approximately 720 white students. This rezoning would involve only a small amount of additional traveling for the students affected thereby.
 
 
 59
 Carver Junior High School has been effectively desegregated by the board's pairing plan, approved by the district court (Appendix "A", p. 1168).
 
 
 Senior High Schools
 
 
 60
 There are only two senior high schools in the Dade County system which remain all- or virtually all-Negro under the board's plan.
 
 
 61
 Miami-Jackson (2193 Negroes, 387 whites) has been effectively desegregated under the district court's direction that attendance zones of Miami-Jackson and Miami Senior High be strictly adhered to (Appendix "A", pp. 1169-1170). The HEW report reveals that if these two attendance zones were made firm, approximately 1,000 more white students would be attending Miami-Jackson. The district court is therefore directed to insure that the school board's policy which allows transfers under an "affidavit of attendance" be halted, that the attendance zones be strictly adhered to, and that only those transfers be allowed which follow the majority-to-minority policy as set forth in the district court's opinion (Appendix "A", p. 1170).
 
 
 62
 Miami-Northwestern (2690 Negroes, 0 white) is the remaining all-Negro senior high school. The district court's rejection of the C.T.A.'s campus grouping plan is supported by substantial evidence that such a plan would call for extensive additional bussing. HEW made no recommendation as to this high school. We find that there is no feasible method of desegregating this high school. It is a large school in the center of the Negro school portion of central Miami. Of the four surrounding senior high schools, three are desegregated and the other is over five miles away. However, many of its students will have attended either a desegregated elementary or junior high school. The district court is directed to insure that the board make the majority-to-minority transfer policy known and readily available to the students attending this school.
 
 DEFICIENCIES TO BE REMEDIED
 
 63
 In conclusion, one of the six criteria which go to make up a unitary school system has been left unsatisfied. The district court is directed to implement the above modifications in Dade County for the 1970-71 school year, supplanted only by modifications submitted by the board within sufficient time to be effectuated by the commencement of the 1970-71 school year which achieve the same or a higher degree of desegregation as achieved by the above modifications. It is not intended by this opinion that the district court be deprived of its discretion to adjust our modifications and any subsequently submitted by the board. Its discretion is limited, however, to the extent that no adjustments may diminish the degree of desegregation required by this court. Of course, the school board and the district court are under a continuing duty to appraise the system in the light of actual conditions and experience and, within the limits we have just indicated, make whatever changes as are required to assure the maintenance of a unitary system.
 
 
 64
 The mandate herein shall issue immediately and no stay will be granted for filing Petition for Rehearing or Petition for Writ of Certiorari.
 
 
 65
 This cause is remanded to the district court for proceedings not inconsistent with this opinion.
 
 
 66
 Affirmed in part; reversed in part with directions.
 
 APPENDIX A
 
 67
 IN THE UNITED STATES DISTRICT
 COURT IN AND FOR THE
 SOUTHERN DISTRICT OF FLORIDA,
 MIAMI DIVISION.

 No. 69-1020-Civ-CA

 HERBERT PATE, et al.,
 Plaintiffs,
 versus

DADE COUNTY SCHOOL
 BOARD, et al.,
 Defendants.

MEMORANDUM OPINION APPROVING
 DESEGREGATION PLAN
 FOR DADE COUNTY PUBLIC
 SCHOOLS WITH MODIFICATIONS
 AND FINAL JUDGMENT

 Filed: Jun. 26, 1970
 
 
 68
 This school desegregation case presents the issue of whether the Dade County School System is now unitary within the meaning of Supreme Court decisions in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S. Ct. 29, 24 L.Ed.2d 19 (1969); Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968) and the decision of the United States Court of Appeals for the Fifth Circuit in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969).
 
 
 69
 The case sub judice had its genesis on August 25, 1969 when the Dade County School Board (hereinafter the Board) removed to this Court a civil action filed in the Circuit Court of the Eleventh Judicial Circuit In and For Dade County, Florida, which attacked, on state grounds, an Interim Desegregation Plan adopted by the Board. That plan was approved by an order which I entered on August 29, 1969.
 
 
 70
 On December 10, 1969, pursuant to the mandate of Singleton, supra, I entered an order which, inter alia, directed the Board to take steps, not later than February 1, 1970, to comply with the provisions of that decision relating to the Desegregation of Faculty and Other Staff, Majority to Minority Transfer Policy, Transportation, School Construction and Site Selection and Attendance Outside System of Residence.
 
 
 71
 In its Final Desegregation Plan filed March 31, 1970, the Board specifically delineated its compliance with the above requirements of Singleton, supra, and with Green, supra, with respect to extracurricular activities and facilities. There has been no complaint regarding any of these particular elements which go to disestablishing a dual school system by any of the many objectors. Accordingly, the Court must assume there has been compliance in these areas. Thus, there remains only a determination of whether the composition of student bodies meets the necessary tests.
 
 
 72
 Hearings were held on January 23, May 22 and June 12, 1970 on the proposed plan and objections.
 
 
 73
 Findings of Fact made in the Order entered January 26, 1970 are incorporated herein by reference.
 
 
 74
 The Board urged at the hearing on May 22 that its plan came within the purview of a true "neighborhood system" as defined by Ellis v. Board of Public Instruction of Orange County, Florida, 423 F.2d 203 (5th Cir., 1970). I find otherwise. Because of the criteria demanded in Ellis, as further delineated in Andrews et al. v. City of Monroe et al., 425 F.2d 1017 (5th Cir. 1970), such a plan is infeasible in Dade County. Clearly, the inflexible Ellis standards are not present in the system proposed by the Board.
 
 
 75
 The criteria used in reviewing, and modifying where indicated, the Board's plan were: (1) degree of desegregation, (2) proximity of students to schools serving their grade level; (3) capacity of such schools; (4) manmade and natural boundaries such as thoroughfares, railroad tracks etc. and (5) avoidance of cross-bussing.
 
 
 76
 The Board will operate in the school year 1970-71 an urban school system of 218 schools and 244,000 students in the southeast corner of the Florida peninsula. Of this number, 57,900 or 23% will be Black. There are some 26 communities in the County, all of which project westerly from the Atlantic Ocean which forms the eastern boundary.
 
 
 77
 The plan filed by the Board on March 31, 1970 reflects a substantial effort, made in good faith, to create a unitary school system. However, under the guidelines laid down for this Court by recent decisions of the Fifth Circuit, the plan as it exists must be held to be ineffective in disestablishing the dual school system.
 
 
 78
 By an order entered April 16, 1970 the Florida School Desegregation Consulting Center, School of Education, University of Miami, Coral Gables, Florida, was requested to review the Board's plan and all objections filed to it. The Center was asked to report its recommendations to the Court with the stated objective of meeting the constitutional standard of a unitary system. The report from the Center was filed by the Department of Health, Education and Welfare (hereinafter HEW).
 
 
 79
 The HEW plan limits its recommendations, except in one particular, to the elementary schools. That one exception concerns Miami Jackson High School which will be 85% black under the Board's plan.
 
 
 80
 Leave to intervene was granted to some persons who objected to portions of the plan. The Dade County Classroom Teachers' Association (hereinafter CTA), representing approximately 75% of the teachers in the system actively participated as an intervenor. It urged, in general, a much more substantial increase in the mixing of the races, particularly at the junior and senior high school levels. The American Civil Liberties Union proposes that the Court require a fixed ratio in every school in the County. The law does not require such drastic action to achieve a unitary system. The objections filed by other intervenors will be considered below.
 
 
 81
 The Court is indebted to intervenors Honorable Claude R. Kirk, Governor of Florida, and Honorable William C. Cramer, a Member of Congress from Florida, for submitting briefs on the subject of bussing as it relates to integration.
 
 
 82
 Wide publicity was given the HEW report. This has resulted in a plethora of letters, telegrams, pictures, maps and petitions being sent to the Court from parents of children who, presumably, would be affected by the HEW changes. Virtually all of these expressed no opposition to integration per se but adjured the Court not to require their children to cross highways, walk past nearby schools to attend one farther away, or enter so-called "ghetto" areas to attend school. I have given careful consideration to these objections vis a vis my duty to effect a unitary school system in Dade County. They have been very helpful in understanding the problems of each school.
 
 PUPIL ASSIGNMENTS
 
 83
 The plan submitted by the Board allows 20 schools to remain with 100% Black enrollments. Additionally, there will be 16 schools with various percentages of Black enrollments ranging from 99% down to 85%. There would be 53 schools with all White enrollments and 40 schools with percentages ranging from 99% to 85%.
 
 
 84
 The plan submitted by HEW would bring below 85% Black enrollment five 100% Black schools and seven 85% to 99% Black Schools. At the same time three 100% White schools and ten 85% to 99% White schools would be brought below 85% White enrollments.
 
 
 85
 The HEW plan makes no recommendation for changing the Board plan on the junior high and senior high levels. Hence, fifteen 100% Black schools (11 elementary, 3 junior high and 1 senior high) and nine 85% to 99% Black schools (7 elementary, 1 junior high and 1 senior high) will remain under the HEW plan.
 
 
 86
 With the modifications to be described below the School Board plan does effectively disestablish the dual school system which exists in Dade County. For the sake of convenience the Court will discuss the modifications it feels are necessary by reviewing the HEW plan in the same order as evidence was presented at the May 22, 1970 meeting.
 
 ELEMENTARY SCHOOL LEVEL SOUTH DISTRICT
 GROUP #1
 
 87
 The Board plan proposes what must be described as square zones with a school somewhere near the middle of the zone. The HEW plan completely rezones the group of schools creating elongated zones. The HEW plan would require additional transportation of 32 pupils to the Lewis School and 20 pupils to the Redondo School. Students living in the north section of the Lewis zone pass within ¼ mile of two schools. Students living across the street from the West Homestead school will walk nearly two miles to the Redondo school. The HEW plan is unacceptable despite its effectiveness in disestablishing the dual school system in this District.
 
 
 88
 The Court is at a disadvantage in making modifications in the Board plan because it does not have the statistical data necessary for informative decisions. The testimony reveals that the Cooper school is 113 pupils under capacity (2-4 classrooms) and the West Homestead school is 85 pupils over capacity. Page seven of the HEW plan shows Lewis to be exactly at capacity and Florida City to be over capacity by 90 students. It appears to the Court that the over capacity could be eliminated while encouraging desegregation of the Cooper and West Homestead Schools by slight changes in the boundary lines of these four schools. The East-West boundary between Lewis and Florida City could be moved to the South by 90 students. The East-West boundary between Lewis and Cooper could be moved to the South and the North-South boundary between West Homestead and Cooper could be moved to the West so as to equalize the capacities of those three schools.
 
 
 89
 The School Board shall show cause within ten days of the date hereof why such a modification will not promote desegregation and is not administratively, economically or educationally feasible.
 
 GROUP #2
 
 90
 Again the School Board plan offers a zoning plan. The HEW plan would pair these three schools thus eliminating one predominantly White school. No additional transportation would be required. The Bel-Aire School would be approximately 30 students over capacity. However, the Administration feels this is a feasible alternative. The Court is aware that there are hazards along the line of travel to the Moton School but feels that with a minimum of effort by the appropriate governmental agencies these hazards could be reduced. Nevertheless these hazards should not impede what is otherwise an effective plan.
 
 
 91
 The School Board is directed to adopt this modification.
 
 GROUP #3
 
 92
 The Court agrees that there is no feasible method to desegregate the Pine Villa School.
 
 ELEMENTARY SCHOOL LEVEL SOUTHWEST DISTRICT
 
 93
 The Board plan leaves the Martin School with a 100% Black enrollment. It phases out the Lee School which prior to the 1969-70 school year was an all-Black School but which was as of June, 1970 a school with 72% Black enrollment. The HEW plan offers no solution to the Martin problem and defers to the Court on the wisdom of phasing out the Lee School.
 
 
 94
 Again the Court is without sufficient statistical data. The record shows that as a school housing grades 1 to 5, Martin will have an enrollment of 1,025 students. The sixth grade is housed at the Richmond Heights Junior High School. There are seven portables at the Martin School. The Colonial Drive School houses grades 1 thru 6 with a projected enrollment of 720 students, 27% of whom are Black. The Court notes what appear to be large undeveloped areas between the two schools on the south side of Coral Reef Drive.
 
 
 95
 The Board shall show cause within ten days of the date hereof why the Martin and Colonial Drive Schools cannot be paired. Emphasis should be directed at encouragement of desegregation, administrative inconvenience, relative capacities and additional transportation required.
 
 
 96
 Since the May 22, 1970 hearing the Court has granted intervenors Corbett and Ellis a rehearing so that they might offer testimony on the phasing out of the Lee School. Testimony was taken on June 12, 1970.
 
 
 97
 The School Board has made the determination that the pairing of Lee and Ludlum in the 1969-70 school year was a failure. The Court agrees, it appears to be useless to attempt a pairing of Lee with any of the other neighboring schools. The Board plan eliminates the Lee zone and in effect drives wedges into the Black residential area surrounding the Lee School from each of four surrounding predominantly White schools. The percentages of Black students will now vary from 8% to 38% instead of 1% to 64% at the end of the 1969-70 school year. Nor does it appear that the phasing out of one of the four neighboring schools would encourage desegregation as well. Without pairing or massive cross-walking of virtually entire student bodies Lee could not continue to operate effectively as a desegregated school.
 
 
 98
 It should be added that the Lee facility will be used to house various programs all of which have been seeking a permanent home for some time. It was the Board's decision to convert the use of the Lee facility and the Court will not interfere with that decision since it promotes establishment of a unitary school system.
 
 ELEMENTARY SCHOOL LEVEL NORTHWEST DISTRICT
 GROUP #1
 
 99
 The School Board plan again offers square zones. The HEW plan proposes a grouping. Since the three schools tend to be at opposite ends of their zones, approximately 274 additional students will have to be bussed over two miles. The grouping plan would create a substantial undercapacity at the Bunche Park School while it creates an overcapacity at the Parkview School requiring at least two portables. It should be noted that the Board plan does not require crossing of either Northwest 167th Street or Northwest 17th Avenue.
 
 
 100
 The Court finds the HEW plan to be unreasonable. Being unable to find another method to desegregate the Bunche Park School, the Court reluctantly embraces the Board plan.
 
 GROUP #2
 
 101
 The Court agrees that desegregation of the North County School cannot be accomplished without extensive use of transportation.
 
 GROUP #3
 
 102
 The Board plan suggests two zones with boundaries determined by natural barriers. The North-South boundary between the zones is eliminated by the HEW plan. Instead the HEW plan would make the Rainbow Park zone a long thin zone running East and West. The net effect is to put some of the Opa Locka School's White students in the Rainbow Park School and some of the Rainbow Park Black students in the Opa Locka School. This plan requires approximately 35 additional students to be bussed and many students to travel across Northwest 27th Avenue.
 
 
 103
 The HEW plan effectively disestablishes the dual school system in this area. The Board is directed to adopt this modification.
 
 GROUP #4
 
 104
 The Board plan zones these two schools according to natural boundaries. The HEW plan would pair them by eliminating the boundary between them at Opa Locka Boulevard. The pairing requires an additional 19 students to be bussed and most students to cross Opa Locka Boulevard. Both schools were already well within their capacities.
 
 
 105
 It should be noted that the Young School is projected to have an enrollment of 85% Black students. The Court is hopeful that under the majority to minority transfer policy to be described below, many white students will seek to attend the Young School from the Opa Locka School and vice versa. Therefore no further modification of the Board plan is required to create a unitary school system in this District.
 
 ELEMENTARY SCHOOL LEVEL NORTH CENTRAL DISTRICT
 
 106
 There are ten schools in this District clustered together in the heart of an all-Black residential community. Eight of the schools (Drew, Evans, Holmes, Liberty City, Lorah Park, Olinda, Orchard Villa and Poincianna Park) have 100% Black student bodies. Two others (Arcola Lake and Gladeview) have predominantly Black student bodies. The only method by which these schools could be effectively desegregated is by cross-bussing with predominantly white schools in the Northeast District. The law does not compel this Court to require the School Board to desegregate these schools in that manner. The School Board plan is, therefore, adopted without change as to these ten schools.
 
 
 107
 The School Board plan would allow the West Little River School to remain with a 92% Black student body. The HEW plan suggests a pairing with the Broadmoor School (1% Black). This alternative would require that approximately 55 students would be transported to the West Little River School. Others would have to travel across Northwest 27th Avenue. Under either plan, both schools are projected to be slightly over capacity.
 
 
 108
 The Board is directed to adopt this modification. The Court notes that the attendance zones of both Broadmoor and Miami Park are varied under the HEW plan. The Court leaves to the discretion of the Board the decision of whether such a variance should be made or, if made in another manner, whether it might reduce the number of students transported to the West Little River School. The Board is limited to the extent that no substantial change shall be made in the racial compositions of the two schools.
 
 ELEMENTARY SCHOOL LEVEL SOUTH CENTRAL DISTRICT
 
 109
 The Board plan allows to remain 5 all-Black schools (Carver, Floral Heights, Pharr, Tucker and Wheatley) and 5 predominantly Black schools (Allapattah, Bethune, Douglas, Dunbar and Earlington Heights). As discussed below, the HEW plan would affect several of these schools. HEW concedes that Allapattah, Earlington Heights, Floral Heights, Wheatley and Douglas cannot be desegregated without substantial transportation. The Court is unwilling to make that concession without further evidence.
 
 
 110
 The statistics the Court has reveal that the Allapattah School houses 1170 pupils in grades 1 through 5. The Buena Vista School houses 695 pupils in grades 1 thru 6. It appears that these two schools could be paired. The Board shall show cause within ten days of the date hereof why such a modification will not promote desegregation and is not administratively, economically or educationally feasible.
 
 
 111
 Likewise the statistics in the Board plan reveal that the Douglas School houses 1400 pupils in grades 1 thru 6. The Riverside School houses 850 pupils in grades 1 thru 6. It appears that these two schools could be paired. The Board shall, in a like manner, show cause why this pairing cannot be accomplished.
 
 
 112
 The Board plan proposes two separate zones for the Bethune and Melrose Schools. The HEW plan suggests a pairing of the two schools. The testimony reveals that the pairing would not present any problems with capacities nor would it require additional transportation. The sole objection is that the East-West Expressway is eliminated as a natural barrier between the two schools. Considering that the Expressway is elevated and that many Melrose students are required, under the Board plan, to traverse Northwest 36th Street and Northwest 27th there is no reason why these schools cannot be paired.
 
 
 113
 The Board is directed to adopt this modification.
 
 
 114
 At this point, for the sake of better understanding, the Court will depart from the pattern of presentation of the HEW plan. The Court notes a concentration of schools between Biscayne Boulevard and the North-South Expressway on the east and west, respectively, and 14th Street and 36th Street on the south and north, respectively. There are five schools in this area; Dunbar (93% Black), West Dunbar (15% Black), Wheatley (100% Black), Miramar (20% Black) and Buena Vista (7% Black).
 
 
 115
 The Board proposes to do nothing to desegregate these schools. The HEW plan would group the Dunbar, Miramar and Buena Vista Schools. The Board offers the sole objection that grouping destroys their neighborhood plan. The Court feels that the grouping should be accomplished.
 
 
 116
 In this regard, the Court notes that the capacities of the remaining two schools in the area are such that by a modification of the HEW grouping plan substantially more desegregation could be accomplished. For instance, if the Wheatley school was rezoned and used in the grouping suggested by the HEW, Dunbar could be paired with the West Dunbar School. Alternatively, it might be feasible to pair Miramar with Wheatley and to pair Dunbar with West Dunbar. Again, Buena Vista could be substituted for West Dunbar in that pairing.
 
 
 117
 The Board shall show cause within ten days of the date hereof why they cannot involve all five of these schools in a plan to disestablish the dual school system in this area. The same criteria as ordered above shall be considered. Should the Board show good cause why additional desegregation cannot be accomplished it is the Order of this Court the grouping plan presented by the HEW plan be adopted by the Board.
 
 
 118
 The Board plan provides separate zones for the Kelsey Pharr and Comstock Schools with the boundary between them falling on the East-West Expressway. The HEW plan pairs these two schools. The evidence reveals that the Kelsey Pharr School has a strict capacity of 840 students without portables. The Comstock School presently has a capacity of 1200 with portables. The Board plan properly balances these capacities. The pairing plan would require the transportation of approximately 123 students to the Kelsey Pharr School.
 
 
 119
 It appears to the Court that the capacity problem could be solved in one of two ways. Either portables could be moved from the Comstock School to the Kelsey Pharr School or the Kelsey Pharr School be designed to house only grades 5 and 6 within present capacities or with the addition of but a few portables.
 
 
 120
 The Board is directed in a like manner as above to show cause why the HEW pairing plan cannot be accomplished with the modifications suggested above.
 
 
 121
 In the Coral Gables area the Board offers a strict zone plan for five schools: Sunset (8% Black), Carver (100% Black) Coral Gables (0% Black), Tucker (100% Black), and Dade (1% Black). The HEW plan would rezone the first three schools and pair the last two. All five will be considered together because the rezoning and pairing plan are closely interrelated.
 
 
 122
 In rezoning Carver, Sunset and Coral Gables, the HEW plan puts 400 White students into the Carver zone from the Sunset and Coral Gables zones and puts 400 Black students in the Coral Gables zone from the Carver zone. This plan creates an over capacity of over 100 students at Coral Gables which might force that school to begin double sessions because there is no room for portables on the site. Approximately 57 students will require transportation. Many students will be required to cross South Dixie Highway. Many students will be required to walk greater distances.
 
 
 123
 The Court is mindful that the Sunset school is proposed to absorb students who formerly attended the Lee School. Also it appears that the HEW plan rezones many students from the Dade School zone into the Coral Gables school zone. The net effect of the HEW plan is to take 150 students out of the Sunset school and place them in the Coral Gables School. It would seem that by returning 100 students to Sunset from Carver and returning 100 students to Carver from Coral Gables the capacities of the three schools will be equalized. If White students and Black students are returned to Sunset and Carver, respectively, no additional transportation will be required and both Carver and Coral Gables will remain as desegregated schools.
 
 
 124
 The Court favors the HEW plan of rezoning but is concerned with equalizing capacities. The Board shall investigate the above suggestions and investigate rezoning in connection with the pairing of the Dade and Tucker Schools and show cause, in a like manner as above, why the HEW rezoning plan cannot be accomplished. In the alternative, if it is found that a rezoning plan is not feasible, the Board shall show cause why a ten-hour day or some alternative scheduling technique cannot be utilized.
 
 
 125
 The HEW plan would pair the Tucker and Dade Schools. Mr. Little testified that the proposed pairing plan would create an overcapacity of about 100 students at both schools. Apparently this is caused by increasing the student population by an amount equal to the number of 5th and 6th graders who are not now allowed to attend Tucker. However, it does not appear that Mr. Little considered two factors. First, the figure used by the HEW plan for enrollment at the Tucker School is overstated by 200 students, thus distorting the HEW plan figures. Second, the HEW rezoning plan discussed immediately above rezones many students out of the Dade attendance zone.
 
 
 126
 Mr. Little also testified that there is no space at Tucker for portables but there may be space at Dade. The pairing plan would require many students to cross South Dixie Highway and travel routes which are presently undergoing sewer construction.
 
 
 127
 The Court favors the HEW pairing plan and feels that the School Board can fashion a plan utilizing rezoning techniques, portables and modified school days which will effectively disestablish the dual school system without sacrificing traditional values. It might be possible to have the Dade and Tucker schools house grades 1 thru 5 in a paired situation and place grade 6 in Carver Junior High School.
 
 
 128
 The Board shall, in a like manner, show cause why this pairing cannot be accomplished.
 
 ELEMENTARY SCHOOL LEVEL NORTHEAST DISTRICT
 
 129
 The Northeast District encompasses the area east of the North-South Expressway and the Sunshine State Parkway and North of 110th Street. Within its boundaries are the municipalities of Miami Beach, North Miami Beach and North Miami. There are 22 elementary schools with only 216 Black students.
 
 
 130
 There is no method by which the schools in this District can be effectively desegregated other than by massive cross-bussing with the predominantly Black residential areas of the North Central District and the South Central District. The Court, therefore, adopts the plan of the Board as it pertains to the Northeast District.
 
 JUNIOR HIGH SCHOOL LEVEL
 
 131
 The Board proposes a zoning plan designed to allow every student to attend the closest school to his home that has the capacity to house him. The guidelines used by the Board are many faceted: (1) proximity to schools; (2) capacity of schools; (3) natural barriers; (4) safety and welfare of the children. All of the optional zones which were present in the Interim Plan adopted by this Court on August 29, 1970 have been eliminated.
 
 
 132
 The HEW plan makes no recommendation to change the Board plan with one exception. The HEW plan takes the attitude that since most of the students who formerly attended Dorsey will be bussed to other schools all these students should be bussed to predominantly white schools. This suggestion is unacceptable for two reasons. First, it ignores the relative capacities of the other junior high schools in this part of the County. It is unlikely that the predominantly White schools could handle all of the former Dorsey students without severe overcrowding. Second, many former Dorsey students can walk to nearby schools. For both reasons the Court rejects the suggestion of the HEW plan.
 
 
 133
 Utilizing the Board plan at this level without modification there will be remaining three all-Black schools, one predominantly Black school, six all-White schools and twelve predominantly White schools. The remaining seventeen schools all have a substantial racial mixture.
 
 
 134
 The Court will discuss the objections to the Board plan in the same order as it discussed the elementary level schools.
 
 SOUTH DISTRICT
 
 135
 The only objection to the Board plan in this District centers around the Richmond Heights School. The alternative is popularly called the Roberts Plan. The HEW plan attests to the educational soundness of this plan. The Board has also conceded to its educational soundness.
 
 
 136
 The Roberts Plan would rezone the boundaries of the Richmond Heights, Palmetto and Cutler Ridge Schools. It is similar to Recommendation 41 of the report rendered July 23, 1969 by the Florida School Desegregation Consulting Center. The apparent sole goal of the plan is to distribute the Black students at the Richmond Heights School between the Palmetto and Cutler Ridge Schools so that they will all have similar mixes of the races.
 
 
 137
 The Board offers several reasons for its decision not to implement the Roberts Plan. It creates a noncontiguous zone whereby students would be transported past the Richmond Heights School. The Palmetto School is already 150 students over capacity even though it utilizes a triple shift. The Richmond Heights School is several hundred students under capacity solely because it is projected to be on a ten-hour day. The Richmond Heights School houses the Martin Elementary School sixth grade because the Martin School does not have the capacity even though it is utilizing seven portables. The Roberts Plan requires the sixth grade to return to the Martin School from which other students will be transported out to other elementary schools. The Board puts emphasis upon their decision that it is the lesser of two evils to have students on a triple shift at Palmetto.
 
 
 138
 The Board has made an administrative decision that should not be interfered with by the Court. The schools in this District are presently substantially desegregated. The Court orders no change in the plan offered by the Board.
 
 SOUTHWEST DISTRICT
 
 139
 The only school in this District which is the subject of an objection is the Richmond Heights School discussed in the South District section. The Court orders no change in the Board plan.
 
 NORTHWEST DISTRICT
 
 140
 The plan proposed by the CTA would involve three schools in this District. (Filer, North Dade and Parkway). Since only the Palm Springs School does not have members of the minority race, the HEW plan offers no recommendation. The CTA suggestion concerning the Filer School will be discussed below in the South Central District section.
 
 
 141
 The CTA plan is designed solely for the purpose of creating a racial mix of 40% Black students in both schools. North Dade is 68% Black and Parkway is 20% Black. The plan would pair the two. In response to the argument that this would force students to cross the Palmetto By-pass, the CTA points out that the Board plan requires students in the Carol City attendance zone to cross the same highway. The plan also would require some additional transportation.
 
 
 142
 The most significant objection to the CTA plan is that since there are three grades and but two schools either the Board will have to put one and one-half grades in each school or split the students between the two schools by some method such as the first and last thirteen letters of the alphabet. This is clearly educationally unsound. Since both schools exist as desegregated schools there is no reason to destroy the traditional organization of the junior high school. For this reason the Court rejects the CTA plan and adopts the Board plan.
 
 NORTH CENTRAL DISTRICT
 
 143
 Other than the plan offered by the CTA involving the Drew, Madison, Mann and Edison Schools no objection is lodged against the Board plan. These schools will be discussed below in the South Central District section. The HEW plan recognizes that the only school in this District that does not have a substantial racial mixture is Drew. The HEW plan asserts that the only method by which the Drew school could be desegregated is by utilizing massive cross-bussing of students between non-contiguous zones. Again you have the recurring problem of violating the traditional concept of a three-grade junior high school. The Court adopts the Board plan.
 
 SOUTH CENTRAL DISTRICT
 
 144
 There are two schools (Allapattah and Brownsville) in this District which remain all-Black schools and one school (Washington) which remains a predominantly Black school. The HEW plan asserts that it would require cross-bussing between non-contiguous zones to effectively desegregate these schools. The CTA plan is the only objection to the Board plan.
 
 
 145
 The CTA plan recognizes that the Ada Merritt School is an all-White school. The plan would pair the Ada Merritt School with the Washington School. To the objection that pairing would require students to cross the Miami River, the CTA replies that the Board has designed the Miami Springs attendance zone to require students to cross the Little River. However, there is a crossing immediately adjacent to the Miami Springs School. The Board further objects to the basis that the present boundaries effectively utilize the capacities of the two school. The Court feels there is no compelling reason to pair these schools since Washington is projected to have an enrollment of 88% Black students. Therefore, the Court rejects the CTA plan.
 
 
 146
 The CTA plan also attempts to desegregate the Allapattah, Brownsville and Drew Schools by cross-bussing students with the predominantly White schools to the west (Filer and Miami Springs). Also included as potential cross-bussing routes are three desegregated schools in the North Central District (Madison, Mann and Miami Edison) and two non-contiguous schools in the Northeast District which are within a six mile radius of this area and which are already receiving transported students from the Drew School (Nautilus and Fisher). The Court commends the CTA for its inventiveness but feels that the law does not require this type of massive cross-bussing to create a unitary school system. The plan offered by the CTA is rejected and the plan of the Board is adopted.
 
 
 147
 The Board has adopted a pairing plan involving the Ponce de Leon and Carver Schools whereby the seventh grade would be housed at the Carver School and the eighth and ninth grades would be housed at the Ponce de Leon School. The Carver School will have a 24% Black enrollment while the Ponce de Leon School will have a 26% Black enrollment. This plan is adamantly supported by the intervenors Jane L. Mack and others. The HEW plan makes no reference to this segment of the Board plan.
 
 
 148
 The pairing plan is strenuously opposed by two groups of intervenors (Donald J. Murray and others and The Concerned Parents of the Riviera Section). Both groups offer a zoning plan commonly referred to as the Ring-Horwich Plan. The intended purpose of this plan is to desegregate one additional school (Shenandoah) while keeping both the Ponce de Leon and Carver Schools as traditional three-grade junior high schools. By redrafting the boundary lines between these two schools and the Shenandoah School (1% Black) the Black student enrollment at the Shenandoah School will be increased. After this rezoning Shenandoah will be 12% Black, Carver will be 19% Black and Ponce de Leon will be 16% Black, thus equalizing the percentages of Black students at the three schools.
 
 
 149
 The rezoning plan would require more than minimal additional transportation. Since the Shenandoah School is three miles from the Carver School many students within walking distance of Carver will need to be transported to Shenandoah. Other students living close to the Carver School will require transportation to the Ponce de Leon School.
 
 
 150
 The supporters of the Ring-Horwich Plan have attempted to show that it is best educationally to utilize the traditional three-grade junior high school at all three of these schools. The School Board would concede this as a general principle. However, the Board has decided that because of the lack of full facilities (library, shops, laboratories, etc.) at the Carver School it is best to house all of this area's eighth and ninth graders in the Ponce de Leon School. Seventh graders do not require a full range of school facilities whereas eighth and ninth graders do require them. Under the Ring-Horwich Plan the eighth and ninth graders at the Carver School would be disadvantaged by the lack of facilities. The facilities that do exist at the Carver School, if used solely by seventh graders, would enhance their educational experience.
 
 
 151
 It therefore appears that the Board has made its decision based upon educational and administrative reasons. To interfere with the Board's decision solely to desegregate one more predominantly Black School when a unitary school system presently exists appears to the Court to be unreasonable. The majority to minority transfer plan to be discussed below should aid in the further desegregation of the Shenandoah School.
 
 
 152
 Accordingly, the Court adopts the Board pairing plan.
 
 NORTHEAST DISTRICT
 
 153
 There are no predominantly Black schools in the Northeast District. All six schools have some pupils of the minority race under the Board plan. The only objection raised, other than the CTA plan discussed above, is presented by Michael A. Frank who, through his father as next friend, has filed his own lawsuit which has been consolidated into this case.
 
 
 154
 The objection, simply stated, is that it is a violation of Plaintiff's constitutional rights to require him to attend a school (Fisher) further from his home while other students are transported to his former school (Nautilus) from distances up to 12 miles past several other schools. Additionally, Black students are transported from non-contiguous zones into both schools. The Board asserts that the primary, in fact the sole, reason for this arrangement is to equalize the capacities of the various schools involved.
 
 
 155
 Since the Board made its recent decision to close down the Dorsey School at least ten schools are being used to house the students that attended Dorsey. Drew has been severely over capacity for years. Fisher and Nautilus were the only schools within a reasonable distance which could house this overflow. Likewise the students living in the northern part of Miami Beach were transported to Fisher because it was the nearest school with available facilities.
 
 
 156
 The Court feels that no constitutional issue is presented by the Frank objection. The objection is simply an attack upon an administrative decision of the Board and nothing more. The Frank objection is rejected and the Board plan is adopted.
 
 SENIOR HIGH SCHOOL LEVEL
 
 157
 The Board plan proposes a system of zoning whereby each student attends a full three-year high school. Distances and capacities are the primary consideration. There would be remaining one all-White school, nine predominantly White schools, one all-Black school and one predominantly Black school.
 
 
 158
 The HEW plan suggests that if the boundary between the Miami Jackson School (85% Black) and the Miami Senior High School was made firm and the two attendance zones were strictly adhered to there would be approximately 1000 more White students attending Miami Jackson. The Board estimates that this figure would be closer to 700 students. In previous years between 200 and 300 students in the Miami Jackson attendance zone have been attending Miami Senior High by use of a procedure called "affidavit of attendance." The evidence is somewhat conflicting on whether or not the Board plan purposes to strictly adhere to the attendance zones.
 
 
 159
 The CTA plan proposes a pairing of these two schools. The evidence reveals that a pairing plan is prohibitively expensive by virtue of the extensive bussing required. There are presently 100 students being transported to the Miami Jackson School. Pairing would require transportation for 1500 students to the Miami Jackson School. A similar situation would be created at Miami Senior High School. This transportation would require an aggregate outlay of $330,000 the first year with recurring expenses of $100,000 annually. On page 4 of the transcript of the February 2, 1970 hearing this Court found that the "Board is utilizing its allowable full tax millage, has an annual budget of 70 to 75 million dollars and is urgently in need of more funds."
 
 
 160
 The pairing plan is rejected and the plan of the Board is accepted with the direction that the attendance zones of these two schools be strictly adhered to, modified only by the majority to minority transfer policy to be discussed below.
 
 
 161
 The plan offered by the CTA points out that there are over 5000 Black students attending Miami Northwestern (100% Black) and Miami Jackson (85% Black). This means that approximately 55% of all Black high school students attend one of these two schools. The CTA plan seeks to desegregate the Miami Northwestern School by offering alternative grouping plans.
 
 
 162
 First, the CTA plan would establish a grouping or campus by combining the attendance zones of Miami Northwestern, Miami Edison (27% Black) and Miami Central (30% Black). The campus concept would create a ratio of White to Black students of approximately 47% to 53%. The Miami Edison School is one mile east of the Miami Northwestern School and the Miami Northwestern School is less than two and one-half miles south from the Miami Central School. The geographic area is comparable to that of the Coral Gables Senior High School attendance zone.
 
 
 163
 Second, the CTA proposes a campus grouping of Miami Northwestern, Hialeah (1% Black) and Miami Springs (9% Black). Evidence relating to these schools was taken at a prior hearing.
 
 
 164
 The Board offered no objections on the administrative and educational level although the Court feels assured that the same problems exist here as discussed above in the grouping of junior high schools in the Northwest District. The evidence does reveal, however, that the campus grouping plan would be detrimental to the normal high school experience. Students would be hampered in participating in extra-curricular activities (debate, athletics, band, etc.) from which activities many students receive college scholarships.
 
 
 165
 The evidence establishes that in the grouping situation there would be increased transportation problems. At least 1000 additional students will require transportation. Only 100 are presently being transported. Approximately $330,000 would be required in the first year to implement the grouping plan.
 
 
 166
 The grouping plan is rejected and the plan of the Board is adopted.
 
 NO CROSS-BUSSING
 
 167
 Neither the Board's plan, as modified herein, nor the HEW plan involve "cross-bussing". As provided by Florida law, students living more than two miles from the school they attend are entitled to transportation.
 
 PUPIL REASSIGNMENT
 
 168
 The Board plan is also to be amended to provide as follows:
 
 
 169
 1. Any pupil, with parental consent, shall have the right to transfer from a school at which his race is in the majority to attend a school at which his race is in the minority, regardless of the availability of space at the latter school, and the Board shall furnish free transportation provided the distance involved meets state transportation statutes.
 
 
 170
 2. All parents in the system are to be notified of this provision.
 
 BI-RACIAL COMMITTEE
 
 171
 A Bi-Racial Committee composed of 12 members, six white and six black, will be appointed by the Court to review the operation of the majority to minority pupil transfer rule, the transportation system, selection of school sites, and such other special assignments as the Court may direct. The Committee is authorized to hold hearings and make recommendations to the Board in connection with these activities. The chairmanship shall alternate annually between a white chairman and a black chairman. Within ten days, the Board and CTA shall each submit to the Court two names and each of the intervenors one name of nominees for the Committee.
 
 REPORT BY THE BOARD AND BIRACIAL COMMITTEE
 
 172
 Within sixty days after the opening of the Fall term of the 1970-71 school year, the Board and Bi-Racial Committee are directed to file reports with the Court as to their findings and recommendations with respect to the operation of the plan as implemented by the Board.
 
 MAYS JUNIOR HIGH SCHOOL EXPERIENCE
 
 173
 This suit was begun, as above recited, by Herbert Pate and others in the State Circuit Court. Its purpose was to enjoin the Board from assigning students for the school year 1969-70 to Mays Junior High School, a previously all-Black school, as part of its plan to desegregate Dade County Schools. With the approval of the Interim Desegregation Plan, such assignments were effectuated. The Court is now informed by means of the news media that integration at Mays has been successful. Accordingly, the Bi-Racial Committee shall, promptly following its appointment, study the practices and procedures utilized at that school and submit a report within thirty days to the Court, together with its recommendations for possible utilization of such practices and procedures by the Board at other integrated schools in the system.
 
 CONCLUSION OF LAW
 
 174
 The plan submitted by the Board, as modified herein, and subject to the revisions to be accomplished as above directed, constitutes a unitary system of public education for the Dade County, Florida school district.
 
 FINAL JUDGMENT
 It is ordered and adjudged that:
 
 175
 1. The Board of Public Instruction of Dade County, Florida, and Edward L. Whigham, as Superintendent of Public Instruction, and his successors in office, are permanently enjoined from operating a dual system of public education segregated by race, and shall henceforth operate a unitary system as described above.
 
 
 176
 2. The transfer of students shall be made effective August 1, 1970 and thereafter.
 
 
 177
 3. The separate petitions of the several intervenors are hereby denied, except as the relief therein sought may be included in the over-all plans herein approved. The separate suits by Michael A. Frank (Case No. 69-1025-Civ-CA) and Joseph Pardo (Case No. 69-1041-Civ-CA) which were consolidated with this suit involve attacks upon administrative decisions by the Board. No constitutional issue is presented. Accordingly, the relief sought in both suits is denied and both suits are hereby dismissed with prejudice.
 
 
 178
 4. The Court retains jurisdiction of the cause and the parties for the purpose of insuring that the plan here adopted and the required amendments are carried out and the school system operated consistently with the requirements of the United States Constitution.
 
 
 179
 Done and ordered at Miami, Florida this 26th day of June, 1970.
 
 
 180
 (Signed) C. CLYDE ATKINS
 United States
 District Judge

cc. George Bolles, Esq.
 Tobias Simon, Esq.
 Walters Moore & Costanzo
 Howell Ferguson, Esq., Legal Services
 Program
 Shutts & Bowen
 Rivers Buford, Esq.
 Hon. Earl Faircloth
 Hon. Claude R. Kirk, Jr.
 Hon. William C. Cramer
 Alan H. Rosenson, Esq.
 Paul B. Steinberg, Esq.
 Aaron Foosaner, Esq.
 Lane & Mitchell
 James E. Glass, Esq.
 James W. Matthews, Esq.
 William A. Frieder, Esq.
 Richard Y. Feder, Esq.
 Wicker, Smith, et al.
 Henry A. Edgar, Jr., Esq.
 Robert R. Frank, Esq.
 J. E. Ludick, Esq.
 William Manker, Esq.
 Daniel N. Heller, Esq.
 Larry S. Stewart, Esq.
 Hillery F. Silverman, Esq.
 Ellis Rubin, Esq.
 Robert M. Bader, Esq.
 
 APPENDIX B
 
 181
 IN THE UNITED STATES DISTRICT
 COURT IN AND FOR THE
 SOUTHERN DISTRICT OF FLORIDA
 MIAMI DIVISION.

 No. 69-1020-Civ-CA

 HERBERT PATE, et al., Plaintiffs,
 versus

 DADE COUNTY SCHOOL BOARD,
 et al.,

 Defendants.

SUPPLEMENTAL ORDER APPROVING
 DESEGREGATION PLAN
 FOR DADE COUNTY PUBLIC
 SCHOOLS, AS MODIFIED, AND
 AMENDED FINAL JUDGMENT

 Filed: Jul. 24, 1970
 
 
 182
 The Court has requested the School Board to submit two reports so that the Court may be fully informed and there will be an adequate record for appellate review. These two reports were filed July 6, 1970 and July 20, 1970. After careful study and analysis of these reports, the Court is prepared to rule informatively.
 
 
 183
 Each school or group of schools which is the subject of a report will be discussed and ruled upon separately. The sequence of discussion will substantially follow the sequence of this Court's Order of June 26, 1970.
 
 ELEMENTARY SCHOOLS
 
 184
 A. L. LEWIS, N. K. COOPER, FLORIDA CITY, WEST HOMESTEAD AND REDONDO ELEMENTARY SCHOOLS
 
 
 185
 The Court agrees that a rezoning of these five schools is impractical. The sole reason is that in an attempt to keep each school within its capacity (some of which are strictly limited) zone lines will have to be drawn in such a manner as to put two schools within one zone. Considering there is a more effective and reasonable plan available, rezoning is rejected.
 
 
 186
 The Lewis and Cooper Schools shall be paired. There are no problems with relative capacities and the safety factors in eliminating the boundary at Southwest 4th Street are minimal.
 
 
 187
 The Florida City and West Homestead Schools shall be paired by placing grades 1 and 2 at the Florida City School and grades 3 to 6 at the West Homestead School. The major objection of the School Board concerns capacities. However, in showing over-capacities, the School Board is using the designed capacity figures. By using the figures showing the capacities with the portables already on the site the over-capacity at the West Homestead School is reduced to 60 students. The School Board estimated membership figures show an enrollment of 40 students over capacity. The over-capacity at the Florida City School is reduced to and under capacity of 20. In its July 6, 1970 report, the School Board states that over-capacities can best be handled at the West Homestead School. There are no serious safety factors.
 
 
 188
 F. C. MARTIN AND COLONIAL DRIVE ELEMENTARY SCHOOLS
 
 
 189
 In pairing these two schools many factors are involved. If grades 1 to 3 were housed at the Martin School the capacities would be equalized. Pairing requires the Colonial Drive sixth grade to be moved to Richmond Heights Junior High School. The junior high school is presently on a ten-hour day which creates an over-capacity sufficient to house the Colonial Drive sixth grade. This has the advantage of desegregating the Martin sixth grade presently being housed at the junior high school.
 
 
 190
 As reasonable as this plan seems, the Court must reject it. The Colonial Drive School is a "pod type" school. Not only is a "pod type" school different in construction and design but the instructional and educational program is, of necessity, also unique. A "pod type" school cannot be used in a traditional manner. Pairing would not in itself destroy the apparent educational advantage of the "pod type" school. However, it is the opinion of the principal of the Colonial Drive School that the adjustment that must be made by the students in going from one type of school to the other type is much easier if made from "pod type" to traditional. With this educational consideration in mind it is necessary to house grades 1 to 3 at the Colonial Drive School. Pairing in this manner would necessitate the use of seven portables thus destroying the educational effectiveness of the "pod type" school.
 
 
 191
 Additionally, because of the geography of the two zones, 183 students will require transportation and the remaining students will be required to walk long distances through remote, undeveloped land.
 
 
 192
 Practically every communication the Court has received from concerned parents of the Colonial Drive School (which is presently integrated) has pleaded that the Martin School be paired with some other school in the area (Vineland, Coral Reef Drive, Miami Heights, Howard Drive, Richmond or South Miami Heights). Because the Martin School zone is isolated on the north side of the west end of Coral Reef Drive, the entire Martin School population would need to be transported to one of these schools.
 
 
 193
 The pairing of the Martin School with any other school is rejected.
 
 
 194
 ALLAPATTAH, BUENA VISTA AND SANTA CLARA ELEMENTARY SCHOOLS
 
 
 195
 The pairing of the Allapattah and Buena Vista Schools is rejected because the Buena Vista School is to be involved in a grouping to be discussed below.
 
 
 196
 At the May 22, 1970 hearing the School Board presented no testimony as to the educational and administrative problems caused by the continuing influx of Spanish language origin students in the school system, arising because of more than 300,000 refugees having been admitted from Cuba as escapees from the Castro regime. Not until the July 6, 1970 response was the Court made aware of this problem. The Court made a further request pertaining to this factor on July 10, 1970. The Court now has an adequate record to evaluate the significance of specially designed programs for Spanish language origin students (hereinafter referred to as Bilingual Education).
 
 
 197
 The Santa Clara School has a significant Bilingual Education program. In pairing it with the Allapattah School a duplication of the program would be required. In addition, the Santa Clara School is the site of the only southern component of the Southeastern Educational Laboratory Project. The Allapattah School does not have any special programs for the disadvantaged pupils. The Court considers the duplication of the Bilingual Education program and a disruption of the Southeastern Educational Laboratory Project total impediments to pairing these two schools.
 
 
 198
 It appears to the Court that in pairing a predominantly Black school with a predominantly White school with 75% Spanish language origin students, the two schools would be integrated only in total figures. Once inside the school building those who are involved in the Bilingual Education program would proceed to one classroom while the remaining students would proceed to another classroom. Effective integration is thus aborted. In the case of these two schools, the remaining students would be about 90% Black.
 
 
 199
 With the addition of the traffic control equipment recommended by the Department of Traffic and Transportation the students could safely traverse Northwest 36th Street. However, it does not appear that the students could safely negotiate around the entrance and exit ramps to the East-West Expressway at Northwest 12th Avenue. This creates a serious safety hazard.
 
 
 200
 A further serious problem is created by the lack of a sixth grade at the Allapattah School. If the Allapattah sixth grade were brought into the pairing, a severe over-capacity would be created. If the Santa Clara sixth grade were removed to the Allapattah Junior High School it would remain there only one year, returning to Lee Junior High School for seventh grade. There is no room at the Lee School to house the Santa Clara sixth grade.
 
 
 201
 Pairing is not educationally or administratively practical and, therefore, must be rejected.
 
 DOUGLAS AND RIVERSIDE ELEMENTARY SCHOOLS
 
 202
 The pairing of these two schools involves the same considerations as those discussed above concerning the Santa Clara School. The Riverside School has a 97.5% Spanish language origin population. The July 20, 1970 report indicates that the expected additional 100 students have arrived at the Riverside School. In addition to the regular Bilingual Education programs, the School Board expects to resume a special program to improve reading performance. The Douglas School has two programs for the disadvantaged pupils (PLAD and Head Start). Pairing requires duplication of the Bilingual Education program and either the loss of or duplication of the programs for the disadvantaged.
 
 
 203
 The duplication of special programs is a sufficient reason for not requiring the pairing of these two schools. However, there are additional reasons. Both schools are presently substantially over capacity. Both schools are presently utilizing the maximum number of portables.
 
 
 204
 The relative capacities of the schools do not allow for a pairing without creating a severe over-capacity at at least one of the schools.
 
 
 205
 The most logical route of travel for the approximately 1700 pupils who would be required to cross the Miami River would be the Fifth Street Bridge. This bridge is an extremely hazardous crossing for pedestrians as four streets converge at that point from the south and three from the north. It is the focal point for much of the traffic in the downtown area. The adjacent and connecting streets are likewise hazardous.
 
 
 206
 Pairing would require transportation for 225 additional students.
 
 
 207
 For all of the above reasons the Court declines to pair these two schools.
 
 COMSTOCK AND KELSEY PHARR ELEMENTARY SCHOOLS
 
 208
 The Comstock School has an 84% Spanish language origin pupil population which is expected to increase. The Kelsey Pharr School has two programs for the disadvantaged pupils (PLAD and Mobile Reading Center). The pairing of these two schools involves the same considerations as those discussed above concerning the Riverside and Douglas Schools. Pairing is, therefore, rejected.
 
 
 209
 Additionally, any pairing plan would leave the Kelsey Pharr School at an under-capacity while the Comstock School would be over-capacity even if it were to utilize the maximum number of portables allowable.
 
 
 210
 DUNBAR, WHEATLEY, BUENA VISTA, MIRAMAR, SANTA CLARA, WEST DUNBAR AND DOUGLAS ELEMENTARY SCHOOLS
 
 
 211
 The Court's order of June 26, 1970 approved the HEW grouping plan but felt that it was to be considered only as a minimum. That same order directed the School Board to show why they could not involve five schools in a single plan. That report submitted July 6, 1970, totally failed in responding to the inquiry of the Court. By Order dated July 10, 1970 the Court again requested information. The report filed July 20, 1970 adequately responds to the inquiry but fails to show good cause.
 
 
 212
 It was not until the July 6, 1970 report that the School Board raised the problem with the Bilingual Education program. At the May 22, 1970 hearing the sole objection to the HEW grouping plan was that it destroys the neighborhood school concept. The Court must presume that in dealing with a group of schools where similar programs exist at several of the schools there is some sort of economy of scale involved making it less impractical to pair or group.
 
 
 213
 The Court has rejected the two pairing plans involving the Santa Clara and Douglas Schools. Therefore, in a relatively compact area there are three predominantly Black schools (Dunbar, Wheatley and Douglas) and four predominantly White schools with substantial Bilingual Education programs. All of the schools have a PLAD program except the Santa Clara and West Dunbar Schools. The Head Start programs, which only involve five-year olds, exist at the Miramar, Dunbar, West Dunbar and Douglas Schools. The total capacity of all seven schools is 7,020 students. The total expected enrollment for all seven schools is 6,820 students.
 
 
 214
 The Court feels that by utilizing a series of pairing plans, a series of grouping plans or a total rezoning of the area that all three of these predominantly Black schools can be desegregated without a significant sacrifice in the special programs. The Court is aware that this entire area is a business and commercial district but feels certain that with the assistance of the Department of Traffic and Transportation any possible safety hazards that may exist will be eliminated.
 
 
 215
 The School Board is directed to use its peculiar expertise in these matters to design a plan for these schools which effectively desegregates the three predominantly Black schools. The Court feels that a predominantly Black school is desegregated when less than 85% of its enrollment is composed of Black students. There are 3,761 Black students enrolled in these seven schools which is approximately 55% of the total enrollment. The School Board is under no direction to create a 55-45 ratio in each of the seven schools but it should be a factor to consider.
 
 
 216
 CARVER, SUNSET AND CORAL GABLES ELEMENTARY SCHOOLS
 
 
 217
 The Court's Order of June 26, 1970 requested the School Board to submit a report showing how these three schools could be rezoned without creating over capacities. Again, the report filed by the School Board on July 6, 1970 is unresponsive. The Court does recognize and fully accepts the representation of the School Board that a conversion to a modified school day should be the last resort. In returning 100 students from the Coral Gables School to the Carver School and 100 students from the Carver School to the Sunset School those closest to the Carver School will be the students who will be affected. The students surrounding the Carver School are predominantly Black. The resulting percentages of Black students at the three schools would be approximately as follows: Coral Gables — 40%; Carver — 58%; and Sunset — 8%. The Court does not consider this to be undesirable.
 
 
 218
 The HEW rezoning plan does present some safety hazards in requiring students to cross South Dixie Highway, LeJeune Road, Bird Road and Ponce de Leon Boulevard. However, with the existing traffic control devices and those that might be recommended by the Department of Traffic and Transportation these hazards are minimal.
 
 
 219
 The Carver and Coral Gables Schools could be desegregated by a pairing plan but this would require approximately twice the number of students to cross these same streets. Pairing would not substantially change the racial composition of the two schools from that of the HEW plan as modified by the Court. The Court does not reject a pairing plan; rather, it leaves it to the discretion of the School Board.
 
 
 220
 The Court notes that Exhibit 2 to the July 22, 1970 report indicates that 122 students have been transferred from the Carver School to the Tucker School. These students are obviously the fifth and sixth grade students who live in the Tucker attendance zone. Since all of the 122 are Black students, the percentage of Black students at the Carver School under the HEW plan as modified by the Court or under a pairing plan would be greatly reduced. The Court is unable to assess precisely the significance of this transfer.
 
 
 221
 The Court approves the HEW rezoning plan with appropriate modifications to relieve the over capacity at the Coral Gables School. The School Board is directed to implement either a rezoning plan or a pairing plan. It is possible that a "domino effect" may be created. The Court is without the expertise to assess exactly how other attendance zones will be affected. This knowledge is peculiarly within the expertise of the School Board. The Court does find that a "domino effect" is not an impediment to implementation of the rezoning plan.
 
 
 222
 The zones which might be affected are those of the Sunset, Tucker, Dade and Coconut Grove Schools. In changing any of these zone lines the School Board is directed to promote as far as possible the creation of substantially equivalent racial ratios in each school. This is not an absolute directive, rather it is intended to insert another consideration which may have been overlooked in the past.
 
 DADE AND TUCKER ELEMENTARY SCHOOLS
 
 223
 The Court has found immediately above that the safety hazards involved in a rezoning of the Carver and Coral Gables Schools were minimal. The two zones involved here are immediately east of the rezoned area. However, the safety hazards are substantially greater in this area. The most logical crossing points for South Dixie Highway (Bird Road and Douglas Road) are extremely congested intersections. Approximately 640 students would be required to negotiate these crossings. Once across South Dixie Highway the majority of students would walk up or down Douglas Road. The north side of Douglas Road has sidewalks. However, the south side has none. Students would be forced to walk eight to ten blocks on the shoulder of a very busy street. This section of Douglas Road is lined with business establishments and high density apartment buildings. The photographs attached to Exhibit 20 of the July 20, 1970 report demonstrate the nature of the safety hazard caused by the construction of a new sewer system in this area. This is a serious impediment to pairing these two schools.
 
 
 224
 Additionally, the Dade School has a 68% Spanish language origin pupil population requiring a Bilingual Education program. The Tucker School has two programs for the under-privileged pupil (PLAD and Head Start). Thus the same problems of duplication exist as discussed above in the pairing of the Santa Clara and Allapattah Schools.
 
 
 225
 The School Board attributes a great deal of educational significance to the difference between a graded and an ungraded curriculum. The primary emphasis is upon the difficulty of the students to adjust in converting from one program to the other. The Court presumes that this problem will be overcome in the first year. However, since both schools will need to be on a graded program a decided educational advantage will be lost to those students who now attend, or would attend, the Dade School. This is a significant consideration.
 
 
 226
 The Court must reject the HEW pairing plan.
 
 
 227
 ARCOLA LAKE and VAN E. BLANTON ELEMENTARY SCHOOLS
 
 
 228
 The relative capacities of these two schools are conducive to pairing. However, approximately 400 additional students would require transportation. Without the construction of a bridge at Northwest 12th Avenue at an estimated cost of $13,000 and a 120-day delay, those students who would be required to walk would have to cross the Little River Canal at either the extreme east end or the extreme west end of the attendance zone. Those students crossing at the westerly end would travel through residential zones. Those students crossing at the easterly end would be required either to travel along Northwest 7th Avenue or take a substantially longer and less direct route through the residential areas. The danger to the students presented by crossing at either of the two bridges and the danger of walking many blocks up heavily travelled Northwest 7th Avenue or over busy Northwest 95th Street is substantial. Even if a bridge were constructed, those students who would use it would be required to walk many blocks north and south along Northwest 12th Avenue and to cross Northwest 95th Street twice a day. The distances and the dangers related thereto make it unsafe to require the pairing of these two schools at this time. By separate order the Court will instruct the Bi-racial Committee to make a further investigation of the possibility of pairing these schools.
 
 
 229
 The Court also is concerned that by pairing the "pod type" Arcola Lake School with the traditional Blanton School that a great deal of the educational superiority of the "pod type" school will be lost. The capacity problem that exists in the pairing of the Colonial Drive and Martin Schools is not present here but the students will be required to make the adjustment which does have significant educational implications.
 
 
 230
 HOLMES COMPLEX, LITTLE RIVER and EDISON ELEMENTARY SCHOOLS
 
 
 231
 The Little River School has a significant enrollment of Spanish language origin pupils as well as a Head Start program, as well as the only Follow Through program in the school system. The Holmes Complex School has four programs for the disadvantaged pupils (PLAD, Mobile Reading Center, Talent Development and Head Start). Since the Head Start programs work with five-year-olds this factor is discounted but is still a consideration. The duplication of efforts involved here, considering that the Edison Park School has no special programs, makes grouping of these schools educationally and administratively impractical.
 
 
 232
 The relative capacities of the schools also make grouping impossible. All of the schools are presently over capacity. The Edison Park School which houses only five grades has no space for portables. The Holmes Complex School has room for only five portables which appear to be needed to house the over-capacity of 135 students. If the Edison Park sixth grade were returned to the grouping, the over-capacities would be even greater. The expected enrollments cannot be split between these schools in any other fashion.
 
 
 233
 Likewise it is impossible to pair the Holmes Complex School with the Little River School. By splitting the grades 1 to 3 and 4 to 6, the Little River School would require five portables to house the over-capacity. By splitting the grades 1 to 4 and 5 to 6 the Holmes Complex School would exceed its maximum capacity using portables. It should be noted that the Little River School is specially designed as a feeder school for Miami Edison Middle School.
 
 
 234
 Although the three schools are rather closely grouped and the Department of Traffic and Transportation could create safe crossings of the major streets in the area, the Court feels a concern for safety simply because of the sheer numbers of students which will be required to walk to school.
 
 
 235
 LORAH PARK, GLADEVIEW, HIALEAH and CURTISS ELEMENTARY SCHOOLS
 
 
 236
 The existence of the Seaboard Coastline Railroad tracks and the surrounding industrial and commercial area is a total impediment to either pairing, grouping, or rezoning these schools. There are three available east-west streets which cross this area, none of which could be made reasonably safe because of the nature of the traffic in the area. Since the schools are substantial distances apart, all walking students will be required to walk much greater distances of up to two miles. Pairing or rezoning would require transportation for an additional 475 to 525 students.
 
 
 237
 The capacities of the schools would permit a pairing of the Hialeah and Lorah Park Schools but the pairing of the Hialeah and Gladeview Schools is foreclosed.
 
 
 238
 The Lorah Park School has two programs for the disadvantaged pupils (PLAD and Head Start) while the Gladeview School has three (PLAD, Mobile Reading Center and Head Start). The Hialeah School has a Bilingual Education program for its 60% Spanish language origin students and while the Curtiss School does not as yet have a Bilingual Education program, it is expected that it will soon require one as the percentage of Spanish language origin students increases above 44%. As discussed above, a pairing or rezoning plan would require a duplication or loss of all these programs thus constituting a further impediment to desegregating these schools.
 
 JUNIOR HIGH SCHOOLS
 
 239
 B. T. WASHINGTON, CITRUS GROVE and ADA MERRITT JUNIOR HIGH SCHOOLS
 
 
 240
 The Court reluctantly but emphatically finds that the grouping of these schools is impossible under every consideration.
 
 
 241
 The Merritt School is expected to be at least 200 students over capacity and there is no room for portables. The Citrus Grove School is expected to be at least 50 students over capacity even though it is utilizing a 10-hour day schedule and there is no room for portables. Considering the limited capacities of these schools it is impossible to house an entire grade level of students from all three schools at either of these two schools.
 
 
 242
 If the Merritt and Washington Schools were paired an even greater over-capacity would be created at the Merritt School while a substantial under capacity would be created at the Washington School. In a like manner, by housing the combined eighth and ninth grades at the Washington School, the Citrus Grove and Washington Schools could be paired. However, Citrus Grove has capacity for the combined seventh grades only if it remains on the 10-hour day. This is totally impractical, particularly when the size and location of the two zones is considered.
 
 
 243
 In addition to the 10-hour day at the Citrus Grove School there is a Bilingual Education program for the schools' predominantly Spanish language origin population. The Merritt School is in an identical situation. The Washington School is specially designed both educationally and in physical plant to provide an experimental pilot and research program for disadvantaged youth, all of whom are Black. Any pairing, grouping or rezoning plan would effectively disrupt these special education programs. The Court notes that both the Washington and Merritt Junior High Schools have two programs in common for the disadvantaged pupil (Curriculum Guidance Project and Neighborhood Youth Corps).
 
 
 244
 Because these three schools have a high concentration of pupils immediately surrounding the school there are only two bridges that could be used to cross the Miami River, (Northwest 12th Avenue and Northwest 5th Street), because most walking students will take the most direct route. There are well over 4500 students in these three attendance zones. If the schools are grouped, approximately one-third will require transportation. Approximately the same number would be required to cross the Miami River. As discussed above in connection with the Riverside School, the Northwest 5th Street Bridge is a seriously dangerous bridge. The safety hazards involved in the number of students crossing the Miami River twice a day is substantial.
 
 
 245
 The Court finds that there is no practical method by which these schools can be desegregated.
 
 
 246
 ALLAPATTAH, R. E. LEE JUNIOR HIGH SCHOOLS and MIAMI EDISON MIDDLE SCHOOL
 
 
 247
 The grouping of these three schools is foreclosed by the capacities. The Miami Edison Middle School is, as its name implies, a true middle school which means that the educational program is uniquely designed for a specific purpose. All of the elementary feeder schools have educational programs specially designed to prepare the students for the middle school. A middle school houses only grades 6 to 8. The Court feels that the middle school concept should be kept intact. The Allapattah Junior High School houses the sixth grade from the Allapattah Elementary School. The Lee Junior High School is a traditional school with grades seven through nine. With two sixth grades, three seventh grades, three eighth grades, and two ninth grades, the only way to group these schools is to house the two sixth grades with the two ninth grades. The Lee Junior High School has no space for additional portables. The Miami Edison Middle School has space for only four additional portables. The Allapattah Junior High School has space for many additional portables. Although space could be made available at the Allapattah Junior High School there is not sufficient space either to bring in the 453 students in the ninth grade at the Miami Edison Senior High School or to drop out the sixth grades at the Miami Edison Middle and Allapattah Junior High Schools.
 
 
 248
 Grouping creates a rambling zone which would require almost every student to cross one of three heavily travelled streets (Northwest 7th Avenue, Northwest 36th Street and Northwest 54th Street) and traverse one of two heavily used North-South Expressway interchanges (Northwest 36th Street and Northwest 54th Street). With approximately 1000 students walking through this area each day a safety hazard is created.
 
 
 249
 The Lee Junior High School has a 58% Spanish language origin population requiring a substantial Bilingual Education program. Grouping would require a three-way duplication of programs. This is unreasonable.
 
 
 250
 The School Board has not submitted figures estimating the number of additional students who will require transportation. Considering the rambling zone created within a grouping plan, it is obvious that extensive transportation will be required.
 
 
 251
 The pairing of the Lee Junior High and Allapattah Junior High Schools is also impractical because there is no place to put the Allapattah sixth grade.
 
 
 252
 The three schools could be rezoned only by severely gerrymandering the zone lines so that each school would have a similar ratio of white to Black students. Of all the seventh, eighth and ninth grade students in the combined attendance zone (including the ninth grade at the Miami Edison Senior High School), approximately 60% are Black students. Simply stated, a rezoning would require the majority of students to cross the same streets in the same manner as discussed above. Rezoning would probably require even more additional transportation than under a grouping plan.
 
 
 253
 The Court finds that there is no practical method by which the Allapattah Junior High School can be desegregated.
 
 
 254
 BROWNSVILLE and MIAMI SPRINGS JUNIOR HIGH SCHOOLS
 
 
 255
 The capacities of these two schools effectively prevent their pairing. The Miami Springs Junior High School houses only seventh and eighth grades while the Brownsville Junior High School has the traditional three grades. If the 705 ninth grade students now being housed at the Miami Springs Senior High School were brought back into the pairing, the two schools would be over capacity by 710 students. The only way these two schools could be paired within their capacities is to put the combined seventh grades at the Brownsville Junior High School and the combined eighth grades and the one ninth grade at the Miami Springs Junior High School. This results in most students spending only one year at each of two schools before going to a third school. This would completely disrupt the traditional concept of a junior high school and is totally unreasonable.
 
 
 256
 Under either a pairing or rezoning plan approximately 600 additional students would require transportation. Those not being transported would be required to cross the same industrial zone surrounding the Seaboard Coastline Railroad tracks that has been found above to present a serious safety hazard. The northern extension of the Miami River does not present a serious safety hazard because many of the Miami Springs Junior High School students are presently crossing it safely.
 
 
 257
 Additionally there exists the recurring problem of a Bilingual Education program at one school and a program for the disadvantaged pupils at the other school. Both schools have the Neighborhood Youth Corps program. The Brownsville Junior High School has a Work-Experience Program which, for obvious proximity reasons, can function effectively only in the Brownsville Community. This program is, itself, a sufficient impediment to pairing or rezoning.
 
 
 258
 There is no practical method by which the Brownsville Junior High School can be desegregated.
 
 
 259
 In addition to the above, the Court's Order dated July 10, 1970 requested information concerning safety factors at schools which the Court ordered paired or grouped in its Order dated June 26, 1970. The School Board has responded in relation to two recommendations made by the HEW plan and adopted by the Court.
 
 
 260
 With the addition of the traffic control devices recommended by the Department of Traffic and Transportation the Court finds that the safety hazards in pairing the Rainbow Park and Opa Locka Elementary Schools are not substantial.
 
 
 261
 In regard to the grouping of the Moton, Perrine and Bel-Aire Elementary Schools the Court remains concerned about the safety hazards that exist in 665 students crossing one of the most heavily travelled thoroughfares in Dade County (U.S. Highway # 1). However, with the addition of the traffic control devices recommended by the Department of Traffic and Transportation and the coordinated efforts of other appropriate governmental agencies the safety hazards will not be substantial. Accordingly, the School Board's alternative request for a rehearing is denied.
 
 
 262
 The School Board failed to submit information on safety factors concerning the HEW grouping plan rejected by the Court for the Bunche Park, Parkview and Scott Lake Schools. In reviewing the statistics on capacity the Court finds that the HEW grouping plan is feasible. Using the HEW plan as submitted 850 students would attend the Scott Lake School. However, the most recent statistics show that this would create an over-capacity of only 40 students. The School Board itself intends to house 850 students there in the Fall.
 
 
 263
 In the alternative, the School Board could house the fifth and sixth grades at the Bunche Park School. This would necessitate splitting the Black students who reside in the Bunche Park attendance zone between the remaining two schools, according to their capacities. It appears that this plan might necessitate additional transportation and increased walking distances.
 
 
 264
 The safety factors appear to be minimal. Therefore, the Court directs the School Board to implement either the HEW grouping plan or, in its discretion, some more desirable alternative.
 
 
 265
 No information was submitted on safety factors concerning the rejected HEW plan of pairing the Young and Westview Schools. The Court, however, reaffirms its prior finding that since there is but one crossing for Opa Locka Boulevard, an arterial thoroughfare, there is a substantial safety factor presented. Also the Court remains hopeful that the majority-minority transfer policy adopted below will encourage many white students in the Opa Locka School zone to transfer to the Young School which has available capacity.
 
 
 266
 The Court has reconsidered, on its own initiative, the safety factors involved in the modifications of the School Board plan already adopted and remains of the opinion that they are not substantial. It is presumed that the School Board will seek to enlist the coordinated efforts of all affected governmental agencies to further minimize the safety factors.
 
 
 267
 The School Board has requested that the Florida High School Athletic Association be impleaded in this lawsuit for the purpose of determining whether students who take advantage of the Majority-Minority transfer policy will become ineligible for athletic purposes. The issue has not as yet arisen and may not. Therefore, without indicating any disposition on the merits, the request is denied. At the time, if at all, a serious problem does arise the School Board will be allowed to take appropriate legal measures.
 
 
 268
 So that there will be no confusion, the Court wishes to point out to all parties and intervenors that the Fifth Circuit has limited the appeal time in school desegration cases. The following is the pertinent quotation from Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1222 (5th Cir. 1969):
 
 
 269
 "In the event of an appeal or appeals to this court from an order entered as aforesaid in the district courts, such appeal shall be on the original record and the parties are encouraged to appeal on an agreed statement as is provided for in Rule 10(d), Federal Rules of Appellate Procedure (FRAP). Pursuant to Rule 2, FRAP, the provisions of Rule 4(a) as to the time for filing notice of appeal are suspended and it is ordered that any notice of appeal be filed within fifteen days of the date of entry of the order appealed from and notices of cross-appeal within five days thereafter. The provisions of Rule 11 are suspended and it is ordered that the record be transmitted to this court within fifteen days after filing of the notice of appeal. The provisions of Rule 31 are suspended to the extent that the brief of the appellant shall be filed within fifteen days after the date on which the record is filed and the brief of the appellee shall be filed within ten days after the date on which the brief of appellant is filed. No reply brief shall be filed except upon order of the court. The times set herein may be enlarged by the court upon good cause shown."
 
 
 270
 Amendment of the Majority to Minority Transfer policy as proposed by the Board in its Reply filed July 6, 1970, is hereby approved.
 
 AMENDED FINAL JUDGMENT
 
 271
 Except as herein modified, the Memorandum Opinion and Final Judgment entered June 26, 1970 are in all respects ratified and affirmed.
 
 
 272
 Done and ordered at Miami, Florida this 24th day of July, 1970.
 
 
 273
 (Signed) C. CLYDE ATKINS
 United States
 District Judge
 
 APPENDIX C
 
 274
 This
 District Court's
 Board's Court's Modifications
 Plan Opinions
Number of schools left
 all- or virtually
 all-Negro under -
 Elementary 30 18 10
 Junior High 4 4 1
 Senior High 2 1 1
 ___ ___ ___
 36 23 12
Number of Negro students
 attending all- or
 virtually all-Negro
 schools under -
 Elementary 23,403 16,519 9,404
 Junior High 6,116 6,116 1,550
 Senior High 5,153 2,960 2,960
 ______ ______ ______
 37,672 25,595 13,914
Percentage of Negroes
 attending all- or
 virtually all-Negro
 schools 64% 44% 24%